Argued and submitted October 28, 1998, affirmed October 27, 1999

## LINN-BENTON-LINCOLN EDUCATION ASSOCIATION/OEA/NEA,
### *Respondent,*

*v.*

## LINN-BENTON-LINCOLN ESD,
### *Petitioner.*

### (UC-22-96; CA A97730)

989 P2d 25

Lisa M. Freiley argued the cause for petitioner. With her on the brief were David W. Turner and Oregon School Boards Association.

Monica A. Smith argued the cause for respondent. With her on the brief was Smith, Gamson, Diamond & Olney.

Before Landau, Presiding Judge, and Wollheim and Brewer,* Judges.

BREWER, J.

Landau, P. J., dissenting.

---

\* Brewer, J. *vice* Deits, C. J.

## BREWER, J.

Petitioner Linn-Benton-Lincoln ESD (district) petitions for judicial review of an order of the Employment Relations Board (ERB) certifying the results of a self-determination election by a group of early childhood interventionists. The district assigns error to ERB's order including the interventionists in the academically licensed employees' bargaining unit. The district contends that ERB erroneously interpreted ORS 243.650(1) and mistakenly relied on its own previous decisions in concluding that the interventionists are eligible for membership in the "academically licensed" unit. The question for decision in this case is whether the interventionists are "academically licensed," as the phrase is used in ORS 243.650. That statute provides, in part:

> "(1) 'Appropriate bargaining unit' means the unit designated by the Employment Relations Board or voluntarily recognized by the public employers to be appropriate for collective bargaining. However, an appropriate bargaining unit cannot include both academically licensed and unlicensed or nonacademically licensed school employees. Academically licensed units may include but are not limited to teachers, nurses, counselors, therapists, psychologists, child development specialists and similar positions."

For the reasons that follow, we affirm ERB's order.

ERB's material findings of fact are essentially undisputed. The district provides educational and support services to school districts in Linn, Benton, Lincoln, and Coos counties. Respondent Linn-Benton-Lincoln Education Association/OEA/NEA (union) represents a bargaining unit of approximately 62 employees who work in the district's special education division (the academically licensed unit). The interventionists provide special education services to infants and young children in the district. OAR 581-015-0900. Interventionists must have earned, at minimum, a bachelor's degree or have had comparable advanced training in early childhood education, special education, or a related field. OAR 581-015-1100(3). They are not required to hold an occupational or professional license from a competent authority in order to engage in their vocation. The district considers the interventionists to be "classified" employees. The district

employs classified personnel in 36 different positions, none of which requires a professional license. Seven classified positions, including the position of interventionist, require a bachelor's degree.

In April 1996, the union filed a unit clarification petition seeking to add the interventionists to the academically licensed unit. After a hearing, the administrative law judge (ALJ) issued a proposed order to include the interventionists in the unit. The district filed objections with ERB, which reversed the ALJ's order. The union filed a petition for reconsideration, contending that ERB erroneously interpreted ORS 243.650(1) by concluding that interventionists are "unlicensed" and therefore ineligible to join with "academically licensed" employees in a single bargaining unit. On April 3, 1997, ERB issued a new order in which it decided that the interventionists are "academically licensed" and thus appropriately included in the unit.

ERB explained its decision on reconsideration as follows:

"[The union] rightly points out that this Board, in *Mid-Valley Bargaining Council* [*v. Greater Albany School Dist.,* Case No. C-17-81, 6 PECBR 4766 (1981)], coined the term 'academically licensed' to describe a community of interest factor to be considered in cases concerning school district employees. For that purpose, this Board could have used a different term—such as 'academically *trained*'—to describe that community of interest factor. The focus of the factor, then, is on 'academic;' and this Board did not intend the term 'licensed,' in the context of cases concerning school district bargaining units, to be strictly construed according to its dictionary definition. This circumstance is explained in the *Mid-Valley Bargaining Council* decision itself where we stated:

"'* * * We specify that the *certificate, license, degree, or the equivalent* must be "academic," as opposed to solely occupational, in order to preclude inclusion in the unit of persons who are required to possess a nonacademic license, such as a driver or chauffeur * * * or journeyman plumber * * *.' 6 PECBR at 4780 * * *.

"According to the job description for interventionists, applicants must possess a '[b]achelor [*sic*] degree or comparable advanced training in the area of special education or early childhood education or related field.' The training required for the position therefore is 'academic.' The degree or certificate that certifies that the holder has completed such academic training is a 'license' for purposes of the community of interest factor that this Board denominates 'academically licensed.' We also conclude that the position of interventionist is of like character to those occupations— other than 'teacher'—listed in the statute as examples of academically licensed employees. The enumerated positions, as they are employed by school districts, share the trait we recognized (concerning school nurses and psychometrists) in *Mid-Valley Bargaining Council*: their duties 'complement those of the teachers in that they all are devoted to enhancing the educational development of students.' 6 PECBR at 4778. The duties of the interventionists, basically intended to assist very young children in their development to help prepare them for school, clearly are complementary to those of the teachers to whom the children one day will be assigned.

"In light of the above analysis, we now hold that we erred in our original Order when we concluded that interventionists do not share with other members of [the union's] bargaining unit the community of interest factor of 'academically licensed.' " (Footnotes omitted, emphasis in original.)

Finally, ERB held that the interventionists do not have a clearly distinct community of interest from the other employees in the academically licensed unit and accordingly must be included in it. As a result, ERB ordered a self-determination election. In June 1997, the elections coordinator certified the election results, which favored union representation. We review ERB's April 3 order because it is a foundation for the order certifying the union. ORS 183.482(8).

ERB is charged by statute with the responsibility of designating an appropriate bargaining unit for school employees. ORS 243.682(1).[1] If the interventionists are "academically licensed," as the phrase is used in ORS 243.650(1),

---

[1] ORS 243.682(1) provides, in part:

"[I]n making its determination [ERB] shall consider such factors as community of interest, wages, hours and other working conditions of the employees

they may be joined in an "appropriate bargaining unit" with other academically licensed school employees. If not, they may only be included within an appropriate bargaining unit consisting of other "unlicensed" or "nonacademically licensed" employees.

■■    In this case, we review ERB's interpretation of statutory terms in the context of an order in a contested case. The terms "academically licensed," "nonacademically licensed," and "unlicensed" are not defined by statute. They are *inexact* terms in that "the legislature has expressed [their] meaning completely, but that meaning remains to be spelled out in [ERB's] rule[s] or order[s]. An inexact term gives the agency interpretive but not legislative responsibility." *England v. Thunderbird*, 315 Or 633, 638, 848 P2d 100 (1993). On review of ERB's interpretation of inexact statutory terms, our role is to determine whether the agency erroneously interpreted the meaning of those terms in its attempt to discern and apply the legislature's intent. *Id.* If legislative intent is clear from the text and context of the statute, then we end our inquiry. If the intent is unclear, then we move to the second level of analysis and examine the legislative history underlying the statute. Finally, if the intent of the legislature remains uncertain, then we resort to general maxims of statutory construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993); *Carroll v. Boise Cascade Corp.*, 138 Or App 610, 614, 910 P2d 1111 (1996).

We begin our analysis with an examination of the text and context of the term "academically licensed." Neither the phrase nor its words are defined by statute. *Webster's Third New Int'l Dictionary*, 1304 (unabridged ed 1993), defines "licensed" as "having a license," and "license" as "a right or permission granted in accordance with law by a competent authority to engage in some business or occupation * * * which but for such license would be unlawful." Although the interventionists need not hold a formal license from a competent licensing authority, ERB concluded that the plain and natural meaning of the word "licensed" is not controlling

involved, the history of collective bargaining, and the desires of the employees. The board may determine a unit to be the appropriate unit in a particular case even though some other unit might also be appropriate."

because of textual and contextual evidence that the legislature intended a broader meaning.

Textually, ERB noted the express inclusion of child development specialists by example in ORS 243.650(1) as "academically licensed" employees. Like interventionists, child development specialists need not hold a professional or occupational license. ERB apparently adopted the union's argument that, because child development specialists need not be licensed in a conventional sense yet are *academically* licensed under the statute, interventionists may be likewise included because they fulfill a similar role in the education of children. Although the comparison provides a possible clue to the legislature's intent, we agree with the district that it is not highly persuasive. OAR 581-023-0050(5), which specifies the qualifications for child development specialists, provides, in part:

> "Individuals contracted as Child Development Specialists shall hold a Personnel Services Certificate, a Personnel Services Certificate of Accomplishment as issued by Teacher Standards and Practices Commission *or be approved to serve in that capacity* by the State Board of Education. * * * [R]equirement of a master's degree is recommended * * *." (Emphasis added.)

Child development specialists must either hold a professional certificate or receive an alternative approval from the State Board of Education in order to practice. Those professional requirements are closely identifiable with the plain and ordinary meaning of the word "license."[2]

However, the listed examples of academically licensed positions are not exclusive. ERB decided that the interventionists "is of like character" to those listed because all of them "enhanc[e] the educational development of students." The problem with that conclusion is that it is not evident from a first step *PGE* analysis.[3] While the interventionists are *academically trained*, and undoubtedly share a

---

[2] While it may be tempting to conclude that the examples of academically licensed positions listed in the statute defeats ERB's interpretation of the phrase based on the principle of *ejusdem generis*, we are wary of the risks inherent in assuming too much from a short list of qualified positions.

[3] The district concedes that the phrase "and similar positions" is a form of express noncompleted legislation that ERB is given delegated authority to complete. *England*, 315 Or at 637. While ERB has delegated authority to determine

community of interest with employees in the listed job positions, the statute does not unambiguously support ERB's conclusion that the interventionists' academic training makes them *academically licensed.*

The district, on the other hand, steadfastly argues that the text resolves the case in its favor because the dictionary definition of the word "licensed" *is* controlling. We disagree. The term we are called on to construe is a phrase consisting of two words: "academically" *and* "licensed." We may not focus on the meaning of one of its component words to the exclusion of the other. The plain, natural, and ordinary meaning of the word "academic" is "belonging to, or associated with an academy or school, esp. of higher learning * * *: formed by school training or associations * * *: based on formal study at an institution of learning, esp. of higher learning." *Webster's* at 9. Institutions of learning do not award licenses to their graduating students: they award certificates, diplomas, degrees, and the like. In other words, they train and educate their students, rather than grant them legal authority to engage in a profession.

The ambiguity of the phrase arises from the conjunction of its constituent words. Because of the differences in emphasis between the words "academically" and "licensed," they simply do not coalesce to signify any single, obvious meaning. The joinder of those words suggests at least two alternative, plausible meanings. The first is that the persons described must be both academically trained and must also be licensed by a competent legal authority. The second is that the persons described must be entitled to engage in a particular occupation or profession by reason of academic training.

what positions are similar to those listed in the statute, its discretion is limited by the meaning of the term "academically licensed." *Springfield Education Assn. v. School Dist.*, 290 Or 217, 224-25, 621 P2d 547 (1980). Although the examples listed in the statute furnish evidence of the term's meaning, we may not simply defer to ERB's apparent conclusion that the interventionists occupy a similar position. ERB's authority is not based on a broad delegation of rulemaking authority resulting from a general, indirect specification by the legislature. If that were the case, then ERB's exercise of its delegated authority would normally be controlling and *PGE*'s methodology would not apply. *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 142 n 12, 903 P2d 351 (1995). However, here, as in *PGE*, we are called on to decide whether the specific, although in this case inexact, terms of a statute conflict with an agency's interpretation of that statute. Therefore, *PGE*'s methodology governs our review.

Each construction requires some clarification or enhancement of the language in the phrase in order to prevail. In order to arrive at the first suggested meaning, the district must add the word "trained" to the word "academically," then add the word "and" between "trained" and "licensed." On the other hand, if the second meaning is what the legislature intended to express, it coined a term for academic training that, in and of itself, qualifies a person for work. That intent could also have been more clearly expressed. It is the need to relate the words to each other in order to evoke a logical meaning for the phrase that makes its meaning ambiguous at the first level of analysis.[4] Both of the meanings that we have suggested plausibly, although not decisively, capture the legislature's intent. Accordingly, we conclude that a textual analysis of the statute does not fully resolve the question.

■　　ERB based its decision largely on the contextual prong of the first level analysis prescribed in *PGE*. ERB concluded that its decision in the *Mid-Valley Bargaining Council* case is part of the context of the 1995 amendment to ORS 243.650(1), which introduced the term "academically licensed" into the determination of appropriate bargaining units. Neither party has cited any case that directly holds that agency decisions either may, or may not, be treated as context for statutory interpretation. However, when

> "administrative expressions of policy are offered as context, courts must be cautious not to *make* policy in the guise of interpretation, or to allow agencies * * * to achieve through a court's interpretation policy objectives that the enactment as promulgated was not meant or failed to embody." *DLCD*

---

[1] The foregoing observation best explains the essential disagreement we have with the dissent's view of this case. The dissent's predominant focus on the word "licensed" leads it to conclude that the statute is not ambiguous, a conclusion that does not withstand scrutiny if the questioned term is construed as a phrase, rather than as two unrelated words. With respect, the dissent never squarely confronts the changes that must be made to the phrase in order to *require* it to read as the dissent would have it.

Nor do we mean to say, as the dissent suggests, that the word "licensed" has no meaning as used in the statute. However, we do agree with ERB that, modified by the adverb "academically," "licensed" could, *as part of a phrase*, plausibly refer to academic training that, in and of itself, qualifies a person for designated employment.

*v. Jackson County,* 151 Or App 210, 218, 948 P2d 731 (1997), *rev den* 327 Or 620 (1998) (emphasis in original).

That caution applies to the tender of the *Mid-Valley Bargaining Council* decision as statutory context. The case never actually employed the precise term used by the legislature but instead used a series of other phrases such as "academic certificate, license, degree, or the equivalent," 6 PECBR at 4772, 4780; "credentialed employe[e]s," *id.* at 4776-77; "professional certification," *id.* at 4777; "certification or educational attainment," *id.;* "certificate, license, degree, or the equivalent must be 'academic,' as opposed to solely occupational," *id.* at 4780; "certificated personnel," *id.* at 4781 n 2. The *Mid-Valley Bargaining Council* case addressed whether "certificated personnel" such as teachers, nurses, psychologists, and similar positions were appropriately grouped together in a single bargaining unit. 6 PECBR at 4766-67. ERB considered the question under ORS 243.682(1), which directed it to consider "such factors as community of interest, wages, hours and other working conditions of the employees involved, the history of collective bargaining, and the desires of the employees." At the time that case was decided, there was no other legislative guidance as to what groupings of employees might constitute an "appropriate" bargaining unit. ERB concluded that a broad unit was appropriate, encompassing all jobs "which, as a condition of employment, require an academic certificate, license, degree, or the equivalent * * *." *Id.* at 4780. In 1995, ORS 243.650(1) was amended to include the "academically licensed" requirement, but it did not include any language about certificates, degrees, or equivalencies.

We agree that it was not implausible for ERB to conclude that the term "academically licensed" is shorthand for its terminology in *Mid-Valley Bargaining Council.* However, the lack of precise symmetry in terminology between the statutory text and ERB's decision makes ERB's conclusion less certain. It is unclear, for example, why the legislature did not use the broader terminology employed by ERB, including academic certification, degrees, and equivalents, if it intended employees such as the interventionists to join a single, professional bargaining unit. The omission may or may not be significant. For that reason, ERB's decision in

*Mid-Valley Bargaining Council* does not shine a bright contextual light on the legislature's adoption of the inexact term "academically licensed" some 14 years later. On the other hand, the district has provided little assistance in the analysis of statutory context because of its mistaken view that the statute's text is decisive. Accordingly, we conclude that the meaning of the questioned terms cannot be determined from a first level analysis under *PGE*.

Neither the parties nor ERB moved to the second level, consideration of legislative history, to inform the inquiry into legislative intent.[5] Unfortunately, the legislative history does not clearly reveal the meaning intended by the term "academically licensed." However, it *does* suggest that the general purpose behind adopting ORS 243.650 was to require educators and others holding professional positions to bargain separately from those employees who perform other occupational tasks.

The original version of the bill stated, "An appropriate bargaining unit cannot contain both teachers and school employees who do not have teaching licenses." Draft, SB 750, February 27, 1995. A representative of the Oregon School Board Association, testifying in favor of that version, indicated an understanding that the measure would separate teachers from classified employees such as transportation workers:

> "Bargaining for teachers and classified employees requires addressing the specific needs of employees in each bargaining unit. As school districts are becoming more heavily regulated through state and federal standards and mandates, there are an increasing number of different issues facing these two groups. This makes it increasingly difficult to support the Employment Relations Board's conclusion [in *Welches Education Association/OEA/NEA v. Welches*

---

[5] In a footnote to its ruling and order on petition for reconsideration, ERB made clear that its analysis did not reach the examination of legislative history:

"[The district] asserts that it is 'pure speculation' that the legislature considered the *Mid-Valley Bargaining Council* case in drafting the amendments to ORS 243.650(1). * * * [The district's] assertion ignores the circumstances that the case is part of the 'context' of the statute and that the legislature employed a term, 'academically licensed,' that was used in the case and is not in general use as a term of art in other contexts."

*School District No. 13*, 12 PECBR 12/304 (July/August 1990)] that working conditions of both employee groups are not disparate. For example, with classified staff, there are requirements that are specific to that employee group, including overtime requirements, fingerprinting requirements, drug and alcohol testing for transportation employees, vacations, etc." Testimony, House Labor Committee, SB 750, April 21, 1995, Ex F (statement of Chris Dudly, Oregon School Board Association).

In contrast, the Oregon Education Association proposed that the bill's language be amended to include "noncertified professional staff" in the teachers' unit. Testimony, Senate Labor and Government Operations Committee, March 2, 1995, Ex D (statement of John Danielson). In a public hearing before the House Committee on Labor, Danielson expressed concern that the original version

"le[ft] some people with no place to go. For example, there are districts where they have sociologists, where they have counselors, they have other professional people [who] do not have teaching licenses, nor are they required to have teaching licenses because of their nature in the system and their work with children and their work with other people in the district, they are more naturally aligned with the professional unit than they would be with the classified unit." Tape recording, House Committee on Labor, SB 750, April 21, 1995, Tape 92, Side B (statement of John Danielson, Oregon Education Association).

Shortly after that testimony, the bill was amended to substitute the term "academically licensed" for the original language. SB 750, May 2, 1995.[6]

Although the foregoing testimonial history is informative, we are reluctant to draw decisive inferences concerning legislative intent from that history for several reasons. First of all, the statements related to earlier versions of SB 750, rather than to its final enacted form. Moreover, the statements were made by witnesses and are not direct expressions of legislative intent. *See, e.g., State v. Guzek*, 322 Or 245, 261, 906 P2d 272 (1995). Finally, any inference drawn from the

---

[6] On June 1, 1995, the Conference Committee further amended the bill to include the examples of "academically licensed" employees contained in the final version. SB 750 amendments, Conference Committee, June 1, 1995.

nature of revisions to the bill after those statements were made is, at best, permissive.

■■ Because the meaning of the statute remains uncertain even after examining the text, context, and legislative history of ORS 243.650, we "resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *PGE*, 317 Or at 612. One of those maxims holds that a court should attempt to construe the language of a statute in a manner consistent with its purpose. *Bartz v. State of Oregon*, 314 Or 353, 358, 839 P2d 217 (1992); *Welliver Welding Works v. Farmen*, 133 Or App 203, 210, 890 P2d 429 (1995). We conclude that following that maxim is the most rational path out of this particular thicket of statutory construction under the teaching of *PGE*.[7]

■ While legislative history is not dispositive, it does provide some guidance when viewed in light of the maxim that we are to construe in accordance with the general statutory purpose.[8] The timing sequence between witness Danielson's expression of concern that professional staff should be aligned with teachers in a single bargaining unit and the subsequent amendments to SB 750, does help tip the scales in favor of ERB's construction of the statute. The interventionists are professional, academically trained staff and, as such, are similarly situated to the other nonteaching professionals that Danielson felt could fall between the cracks under the former language of the bill.

When we consider all relevant evidence of the legislature's purpose, including the evolution of the statutory language during the 1995 legislative session, the similarity

---

[7] We are mindful of the criticisms that flow from a judicial search for legislative purpose at the third level of analysis under *PGE*. Jack L. Landau, *Statutory Construction in Oregon*, 32 Willamette L Rev 1, 57-66 (1996). However, we conclude that no other nontextual canon of construction informs our analysis in any meaningful way. *See, e.g.,* ORS 174.030 (natural rights); *Westwood Homeowners' Assn, Inc. v. Lane County*, 318 Or 146, 160, 864 P2d 350 (1993), *adhered to as modified on recons* 318 Or 327 (1994) (statutes should be construed to avoid unconstitutionality).

[8] It is appropriate to allude to legislative history at the third level of the *PGE* analysis. *See Windsor Ins. Co. v. Judd*, 321 Or 379, 387-88, 898 P2d 761 (1995). Although the legislative history cited here is not clear enough, standing alone, to allow us to render a decision at the second level, in combination with *Welliver Welding Works*'s maxim of statutory construction, we find its guidance useful.

between the statutory terms and those used by ERB in the *Mid-Valley Bargaining Council* decision, and a comparison of the nature of the interventionists' position with those positions expressly included by statute in the academically licensed classification, it seems consonant with that purpose to place the interventionists with other professionals in the academically licensed category. The interventionists' position requires academic training and involves a direct professional service to students. Including them in the academically licensed unit is in keeping with what appears to have been the legislature's general purpose in distinguishing between academically licensed and nonacademically licensed employees.[9] Although our analysis takes a different route, we therefore conclude that ERB correctly interpreted ORS 243.650 to include the interventionists in the academically licensed unit.

Affirmed.

**LANDAU, P. J.,** dissenting.

At issue in this case is whether the position of "interventionist" is "academically licensed" within the meaning of ORS 243.650(1) when the position requires no "license." The Employment Relations Board (ERB) originally concluded that the position is not "academically licensed," because it requires no "license" in the ordinary meaning of the term. On reconsideration, ERB changed its mind. In my view, ERB got it right the first time.

The majority disagrees. It begins with the assertion that the term "licensed" ordinarily means "a right or permission granted in accordance with law by a competent authority to engage in some business or occupation[.]" 163 Or App at 563 (quoting *Webster's Third New Int'l Dictionary*, 1304 (unabridged ed 1993)). It then concludes, however, that, when

---

[9] The dissent's criticism of the relative strength of individual elements of our analysis at the second and third levels under *PGE* makes few points that we do not acknowledge. Nonetheless, because the indicia of legislative intent are not plain and overwhelming, of necessity, our resolution of the case relies on the cumulative weight of the available evidence of that intent at each stage of the analysis. The dissent's proposed resolution of the case, because it mistakenly comes at the first level under *PGE*, does not fully sort out the evidence so as to arrive at the most probable construction of the legislature's intent.

combined with the modifier "academic," the word becomes ambiguous. The majority then resorts to legislative history and maxims of construction to arrive at the conclusion that the term "licensed" means merely training, whether or not that training leads to a license. Thus, the majority ultimately holds that the position of interventionist, which requires no license, nevertheless is "academically licensed."

The majority's analysis is flawed and its conclusion incorrect. There is nothing ambiguous about ORS 243.650(1). It says that an appropriate bargaining unit cannot contain both "academically licensed" and "unlicensed or nonacademically licensed school employees." ORS 243.650(1). The statute does not define what the term means, but it does expressly say what it includes, namely, "teachers, nurses, counselors, therapists, [and] child development specialists * * *." *Id.* When a statute defines a term merely indicatively, the general rule is that anything else that is to be included must partake of the common characteristics of what the legislature has listed in its statutory examples. That is the rule of *ejusdem generis. See, e.g., Gaston v. Parsons*, 318 Or 247, 253, 864 P2d 1319 (1994).

Ordinarily, I am skeptical of the use of such textual maxims, because they are so easily manipulated; a given list of items in a statute can have any number of different characteristics in common. In this case, however, the legislature has gone to the trouble of telling us what, at a minimum, must be considered a common characteristic: There must be a "license." That unremarkable insight is borne out by the fact that each of the occupations listed in ORS 243.650(1) by way of example of what is meant by "academically licensed" requires a "license" in the common, ordinary meaning of the term.[1]

---

[1] Thus, the majority's complaint that the list of items in ORS 243.650(1) is too "short" to warrant reliance on the rule of *ejusdem generis* makes no sense. Because the legislature itself has told us what the common feature of the items is, the number of enumerated items is irrelevant. In any event, whatever the merits of the majority's suggestion that a minimum, critical mass of enumerated items is required before relying on the rule, the fact is that in this case, the enumerated list in ORS 243.650(1) numbers a half dozen—twice what the Supreme Court has required to invoke the rule. *See Gaston*, 318 Or at 253 (three enumerated items).

That being the case, the issue before us is easily resolved. It is undisputed that the position of interventionist requires no "license" within the ordinary meaning of that term. It necessarily follows that the position cannot be "academically licensed" within the meaning of the statute.

The linchpin of the majority's contrary conclusion appears to be its assertion that there is something ambiguous about the term "licensed" as it is used in ORS 243.650(1). "Ambiguity" itself is a term of art, however; it refers to cases in which statutory or contractual language is reasonably capable of meaning more than one thing. *State v. Cooper*, 319 Or 162, 167, 874 P2d 822 (1994) (statutory language is ambiguous when capable of two interpretations and "either interpretation is reasonable"); *Tee v. Albertson's, Inc.*, 148 Or App 384, 390, 939 P2d 668 (1997), *rev den* 326 Or 465 (1998) ("There must be some evidence contained in the language of the statute that gives rise to a reasonable conclusion that the legislature may have intended more than one meaning."). The majority never identifies the plausible, multiple meanings of the term at issue.[2] Its argument, therefore, fails at the outset.

The majority then attempts to reason its way around the problem as follows. First, it identifies the ordinary meaning of the term, as I have described above. Then it suggests that, based on the context of the statute, it appears that the legislature may have intended a "broader" meaning of the term. The "context" to which the majority refers is a 1981 decision of the Employment Relations Board (ERB), *Mid-Valley Bargaining Council v. Greater Albany School Dist.*, 6 PECBR 4766 (1981), which the majority reads as using language that the legislature could have relied on in crafting the

---

[2] The majority offers what it characterizes as two alternative readings of the term "academically licensed." On the one hand, the majority says—correctly—that it could mean that the term may require a license with formal academic prerequisites. On the other hand, the majority says that it could mean merely that particular academic training is required to be entitled to engage in the particular occupation with no license requirement. 163 Or App at 565-66. The problem is that the majority has not offered two plausible interpretations of the term "academically *licensed*," given that its second interpretation explicitly assumes that the term "licensed" has no meaning. I do not understand, and the majority does not explain, how a plausible construction of a term includes declaring that it simply means nothing.

term "academically licensed" in ORS 243.650(1). The majority's reasoning is too much of a stretch for me.

To begin with, I question whether it is appropriate to rely on a single decision of an administrative agency as "context" for a statute enacted 14 years later. The term generally refers to information about which the legislature likely was aware during the enactment process. Given that our objective is the ascertainment of the intentions of the enacting legislators, ORS 174.020, that only makes sense. Thus, for example, other statutes on the same subject are considered context only if they were enacted before the statute at issue. *Stull v. Hoke*, 326 Or 72, 79-80, 948 P2d 722 (1997). Even judicial opinions are regarded as context for a statute only when there is some connection between the earlier opinions and the enacted language, that is, some basis from which the courts can infer that the legislature might have taken the opinions into account during the enactment process. Thus, in *Jones v. General Motors Corp.*, 325 Or 404, 419, 939 P2d 608 (1997), the Supreme Court rejected the suggestion that federal cases construing the federal summary judgment rule provided context for the construction of the Oregon summary judgment rule. The court reasoned that nothing in the language of the Oregon rule suggested a connection to the pre-existing federal case law. *Id.*

In this case, the majority offers no textual basis for inferring that the legislature might have been aware of the *Mid-Valley* decision, much less that, more than a dozen years later, the decision formed the basis for the legislature's coinage of the term "academically licensed" in ORS 243.650(1).[3]

---

[3] The majority cites our opinion in *DLCD v. Jackson County*, 151 Or App 210, 948 P2d 731 (1997), *rev den* 327 Or 620 (1998), as referring to the use of decisions of administrative agencies as context for legislative enactments. The decision actually does not say that, however. In that case we referred to statements of policy, by both the legislature and administrative agencies, as context for the meaning of statutes and administrative rules, respectively:

"Statutes and rules often contain statements of general policy * * *. Such expressions *can* serve as contextual guides to the meaning of particular provisions of the statutes or rules * * *."

*Id.* at 218 (emphasis in original). The caution is not about the use of administrative decisions as context for interpretation of statutes. It is about the use of statements of administrative policy as context for the construction of administrative rules.

To the contrary, the majority acknowledges that the *Mid-Valley* decision never mentioned the term "academically licensed." The best the majority can offer is the fact that, in *Mid-Valley*, ERB used some terms that were similar in phrasing, albeit—in the majority's own characterization—substantially broader phrasing than what appears in the statute.

In that regard, I suggest that, even assuming that the *Mid-Valley* decision properly may be regarded as context, the decision does not lend the support that the majority draws from it. The *Mid-Valley* decision used not the term "academically licensed," but the phrase "academic certificate, license, degree or the equivalent." If we are to assume that the legislature was aware of that language and relied on it in enacting ORS 243.650(1), then it is apparent that the legislature apparently chose *not* to use ERB's language and instead chose to eliminate from the statutory terminology any reference to "certificate, * * * degree or the equivalent." Thus, the majority anomalously relies on *Mid-Valley* to read back into the statute precisely what the legislature chose to leave out. I suggest that, to the extent that *Mid-Valley* can be relied on for anything with respect to the interpretation of ORS 243.650(1), the decision supports the proposition that the statute means no more than what it says.

Even the majority concedes that *Mid-Valley* lends weak support for its reading of the statute. Accordingly, it proceeds to an examination of the legislative history. Relying on the statements of two lobbyists, the majority finds further support for its reading of the statute. The statements of lobbyists, however, provides little evidence of the intentions of the enacting legislators without some suggestion that the legislature agreed with, and relied on, the statements. As the Supreme Court cautioned in *State v. Guzek*, 322 Or 245, 261, 906 P2d 272 (1995):

> " 'In general, an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment. By contrast, an examination of legislative history is most fraught with the potential for misconstruction, misattribution of the beliefs of a single legislator or witness to the body as a whole, or abuse in the form of "padding the record" when the views of only a

small number of persons on a narrow question can be found.' "

(Quoting *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 539 n 4, 888 P2d 544 (1995) (Graber, J., dissenting).) In this case, there is no one, much less a small number of persons, speaking to the narrow question at issue. The statements of the two lobbyists the majority quotes did not concern the issue of defining the meaning of "academically licensed." The statements did not even concern the same version of the bill that ultimately was enacted as the statute at issue in this case.

The majority insists that the legislative history nevertheless is "informative," although it concedes that it is not dispositive. It therefore proceeds to a "third-level" maxim of statutory construction, namely, that we attempt to construe a statute to conform to its purposes. I do not quarrel with the maxim. But the majority does not properly apply it in this case.

The maxim of effectuating legislative purpose presupposes an identifiable purpose, which is used as the basis for selecting between competing constructions. The rationale is that, when confronted with competing interpretations otherwise in semantic equipoise, we assume that the legislature would have intended us to select the interpretation that best effectuates the statute's broader purpose. Thus, in *Welliver Welding Works v. Farmen*, 133 Or App 203, 210, 890 P2d 429 (1995), we resolved an ambiguity in a provision of the workers' compensation statute by reference to its purpose as explicitly stated in the statute itself.

In this case, there is no such clearly stated purpose. Indeed, the majority does not ever identify precisely what the purpose of the statute is. Moreover, the majority never explains why its construction effectuates the purpose of the statute, whatever it may be, and why the construction that it rejects does not effectuate that purpose. Instead, the majority reverts to the legislative history—the same legislative history that the majority previously conceded has limited value—to arrive at the conclusion that it "tip[s] the scales" in favor of its reading of the statute. 163 Or App at 570. Thus, somewhere between the second and third levels of analysis—

with no additional evidence of legislative intent—the same legislative history that was once inconclusive is transformed into being dispositive.

Disposition of this case does not require such feats of semantic sleight of hand. As ERB correctly held in its original decision, the legislature made clear its intentions with the language it enacted. An "academically licensed" position requires a "license." The position of interventionist requires no license. Therefore, it is not "academically licensed" within the meaning of ORS 243.650(1). The majority errs in concluding otherwise. I, therefore, respectfully dissent.