Argued and submitted September 27 Nyssa High School, Nyssa, affirmed December 27, 2006, petition for review allowed May 1, 2007 (342 Or 644)

# STATE OF OREGON,
*Respondent,*

*v.*

# JOSEPH NATHAN LONERGAN,
*Appellant.*

20-03-00729; A121288

149 P3d 1215

John Susac, Deputy Public Defender, argued the cause for appellant. On the brief were Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, and Tammy W. Sun, Deputy Public Defender, Office of Public Defense Services.

Katherine H. Waldo, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Bethany Cunningham, Assistant Attorney General.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals from a judgment of conviction for escape in the second degree.[1] ORS 162.155(1)(a). He assigns error to the denial of his motion for judgment of acquittal (MJOA). As explained below, it is undisputed that, after escaping from the custody of an arresting officer, defendant used physical force to prevent recapture. He argues that that fact is insufficient, as a matter of law, to prove that he "use[d] physical force escaping from custody." *Id.* We affirm.[2]

The material facts are undisputed. Springfield Police Officer Donald Myers responded to a reported automobile theft in rural Lane County. After Myers found defendant driving the stolen truck, defendant made various attempts to avoid arrest—including jumping out of the still-moving truck and running away into the bushes on the side of the road. After chasing defendant through the bushes and ordering him to stop, Myers eventually took defendant into custody, handcuffed him, and walked him back to the patrol car waiting on the road.

At the car, Myers "laid [defendant] over the trunk" while he reached into the car to get a radio to call for assistance. As Myers reached for the radio, defendant "took off running." Myers chased defendant for approximately 50 to 75 yards before tackling him to the ground. Once on the ground, defendant wrestled with and kicked Myers in an attempt to get away. Myers "deliver[ed] several focused blows to [defendant's] head and shoulders[,]" but defendant continued to fight. Eventually, defendant gave up and Myers was able to walk him back to the patrol car.

---

[1] Defendant was also convicted of unauthorized use of a vehicle, ORS 164.135; attempting to elude a police officer, ORS 811.540; second-degree criminal mischief, ORS 164.354; and first-degree theft, ORS 164.055. He does not challenge any of those convictions.

[2] In his supplemental brief, defendant also raises an unpreserved challenge to certain portions of his sentence. That challenge is based on *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), and *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), but is controlled by *State v. Gornick*, 340 Or 160, 130 P3d 780 (2006). Thus, we reject that argument without further discussion.

The state charged defendant with numerous crimes, including second-degree escape. ORS 162.155(1)(a).[3] After the state's presentation of evidence, defendant moved for a judgment of acquittal on that count. In support of his motion, defendant cited *State v. Metcalfe*, 172 Or App 501, 505, 19 P3d 374 (2001), in which we held that an escape is complete even if a defendant "momentarily" leaves a peace officer's control. Based on that holding, defendant argued that he did not use physical force "escaping from custody," but that, instead, he used physical force to try to avoid recapture *after* his escape:

> "What we have here is that [defendant] set out on a course of action and just with this definition here, just as in this definition, that action resulted momentarily in his being out of Officer Myers's control and there's no dispute over that.

> "At that point, the crime of escape is complete, but there was no physical force which is an element of escape, second degree. So what we have here is that—is an escape, third degree, because the physical force that was involved happened after the escape was complete and—Officer Myers's testimony, the physical force occurred when he was attempting to place [defendant] back into custody.

> "* * * In [*Metcalfe*], the State argued successfully that escape is a de minimus situation, that any momentary situation where a person is no longer in the control of the officer constitutes an escape.

> "* * * [T]he State stuck with that argument, they're stuck with that decision, which means that the act of escape is a momentary act. It becomes complete at a certain point.

> "* * * * *

> "So our position here is that it's a completed escape, it's Escape Third Degree, because there's no element of physical force during the completed act of escaping."

---

[3] ORS 162.155(1)(a) provides:

"(1) A person commits the crime of escape in the second degree if:

"(a) The person uses or threatens to use physical force escaping from custody[.]"

The state responded:

"So the argument that the escape is already complete, well, the escape—the escape is under way. He hasn't gotten away. So the escape is under way at the time the officer catches up with him and then he uses or threatens the use of physical force * * *."

The trial court agreed with the state, denied defendant's MJOA, and subsequently convicted defendant of second-degree escape. Defendant appeals his conviction assigning error to the denial of his MJOA.

As in any other case that turns on the interpretation of statutory language, we utilize the methodology from *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We begin with the text of the statute in context. *Id.* at 610-11.

ORS 162.155 provides, in part:

"(1)   A person commits the crime of escape in the second degree if:

"(a)   The person uses or threatens to use physical force escaping from custody[.]"

This case turns on the correct interpretation of the phrase "uses * * * physical force *escaping from custody*." (Emphasis added.) That determination depends, in turn, on the resolution of two subsidiary questions. *First*, is "escaping" an ongoing action capable of continuing over a period of time? *Second*, if so, under what circumstances, if any, is force used after an escapee's immediate departure from custody considered to be the use of "physical force escaping from custody"?

In *Metcalfe*, which is central to defendant's position, we engaged in a detailed "first-level" *PGE* deconstruction of "escaping from custody" for purposes of ORS 162.155(1)(a). Consequently, we turn to that case.

In *Metcalfe*, the defendant, a prisoner in Multnomah County, was brought to a courtroom for proceedings on a criminal offense. His handcuffs were removed, he was allowed to sit at a table, and he was instructed to remain seated at that table. 172 Or App at 503. While the judge was speaking, the defendant jumped from his seat, "pushed off of"

the officer who had escorted him, ran toward the back door of the courtroom, and was then subdued by a different officer at the doorway. *Id.* The defendant was charged with, and convicted of, second-degree escape. He argued that his actions could not constitute an escape but, rather, only an attempted escape.[4] *Id.*

We disagreed. We began by noting that, although ORS 162.155 itself does not define any of the operative terms, ORS 162.135(5) does define "escape" for purposes of second-degree escape:

> "ORS 162.135(5) defines the term 'escape' * * * as 'the unlawful departure of a person from custody[.]' The key words in that phrase are 'departure' and 'custody.' As it is ordinarily understood, a 'departure' includes 'a setting out (as on a journey * * *).' *Webster's Third New Int'l Dictionary*, 604 (unabridged ed 1993). ORS 162.135(4) expressly defines the term 'custody' as 'the imposition of actual or constructive restraint by a peace officer pursuant to an arrest or court order[.]' The plain meaning of the term 'restraint' includes 'an act of restraining, hindering, checking, or holding back from some activity' and 'the condition of being restrained, checked, or controlled.' *Id.* at 1937. The plain meaning of the term 'restrain' includes 'to hold (as a person) back from some action, procedure, or course : prevent from doing something' and 'to limit or restrict to or in respect to a particular action or course : keep within bounds or under control.' *Id.* at 1936. In addition, the preposition 'from' is 'used as a function word to indicate a starting point: as (1) a point or place where an actual physical movement (as of departure [or] withdrawal * * *) has its beginning.' *Id.* at 913."

172 Or App at 504-05 (footnote omitted; brackets in original). From those definitions, we concluded:

> "[A] person 'escap[es] from custody' within the meaning of ORS 162.155(1)(a) when a person subject to actual or constructive restraint or control by a peace officer sets out on a

---

[4] The defendant in *Metcalfe* did not dispute that he used physical force sufficient to constitute second-degree escape. 172 Or App at 504. Therefore, the only issue addressed was the proper interpretation of the phrase "escaping from custody." *Id.*

course of action and that setting out results, *even momentarily*, in the person no longer being within the peace officer's restraint or control."

*Id.* at 505 (second brackets in original; emphasis added). We went on to hold that, viewing the evidence most favorably to the state, a reasonable juror could find that the defendant had, in fact, momentarily left the constructive restraint he had been placed in, and that, therefore, his actions constituted an "escape from custody." *Id.* at 506-07.[5]

Here, as explained above, defendant argues that under *Metcalfe*'s analysis of "escape," the escape in this case was "complete" before defendant used physical force on Myers. That is, defendant asserts that he had completed his escape from Myers without the use of physical force—and only used force when Myers later attempted to reestablish custody. Consequently, defendant contends that his escape from custody is properly characterized as third-degree escape.[6]

In response, the state argues that nothing in *Metcalfe* suggests that an escape is always, and for all purposes, "complete" immediately upon a person's departure from custody. That is, although a person may have "escaped" in the sense of having successfully acted to be even momentarily out of restraint and control, he or she may still be "escaping" in the sense of "making good" his or her escape. Thus, the state reasons, although defendant "escaped" when he "took off running" from Myers's patrol car, he was still in the ongoing process of "escaping" when he used force in an effort to frustrate the officer's instantaneous efforts to recapture him. Further, at oral argument, counsel for the state suggested that defendant's construction of "escaping" as a

---

[5] *See also State v. Fitzgerald*, 16 Or App 376, 518 P2d 678 (1974). In *Fitzgerald*, the defendant, an inmate at Oregon State Penitentiary, ran away from an escorting officer while he and other inmates were being transported from the Marion County Courthouse back to the penitentiary, but stopped running, in response to a warning shot, after getting 15 to 20 steps away. We held that the prisoner was "out of the guard's custody although only momentarily so," *id.* at 379, and thus affirmed his second-degree escape conviction. *See* ORS 162.155(1)(c).

[6] Defendant acknowledges that, under his "third-degree escape" theory, he could potentially also be convicted of a second crime, for example, some species of assault or resisting arrest.

single, time-discrete event, rather than as a process, would compel anomalous, "Keystone Kops"-like results that the legislature never intended:

> "What if, in this case, defendant had taken a couple of steps, the officer had grabbed at the defendant, the defendant had pushed him, [the defendant got away for 10 feet,] the officer followed him and grabbed him, the defendant pushed him, and they continued this, almost 'Keystone Kops' kind of thing for 50 yards, where the defendant is continually using force to resist being retaken by the officer? That seems to me to be—is each time the defendant pushes off a separate escape? I don't think so."

The state's construction is reasonable given the statute's syntax, *viz.*, "escaping," which can reasonably be understood as connoting a process. Further, the state is correct that in *Metcalfe*, in construing ORS 162.155(1)(a), we were not faced with the proper application of that statute to the circumstances presented here and did not purport to prescribe an exclusive construction. Finally, and in a related sense, as a logical matter, our construction in *Metcalfe* does not preclude the state's construction. There is no necessary inconsistency in concluding that a person who has "escaped" with an officer in hot pursuit is still in the process of "escaping."

Conversely, defendant's position is also plausible at *PGE*'s first "text-in-context" level. Defendant's proposed construction draws support not only from our discussion in *Metcalfe*, but also, at least arguably, from the distinction between "escape" as a "departure * * * from custody," ORS 162.135(5), and "resisting arrest," ORS 162.315(1), as, *inter alia*, "the use of * * * physical force [creating] a substantial risk of physical injury" in resisting efforts *"to place a person under actual or constructive restraint or to take a person into custody* for the purpose of charging that person with an offense." ORS 162.315(2)(a), (c); ORS 133.005(1) (emphasis added). Given that context, it is reasonably plausible that the legislature may have intended to differentiate between circumstances in which a person uses physical force enabling him or her to depart (albeit momentarily) from custody and circumstances in which a person uses physical force to avoid the imposition—or reimposition—of custody.

Faced with multiple textually plausible constructions, we proceed to legislative history. Before 1971, Oregon's escape statutes made no mention of the use of physical force. *See former* ORS 162.350 (1959), *repealed by* Or Laws 1961, ch 649, § 9; *former* ORS 162.322 - 162.324 (1961), *repealed by* Or Laws 1971, ch 743, § 432. In addition, they did not divide the crime into different degrees. *Id.* In 1970, however, the Criminal Law Revision Commission proposed what is now ORS 162.145 to 162.165 (escape in the third, second, and first degrees). Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 190-192, 194 (July 1970). The Commission's commentary, although not itself dispositive, offers some useful guidance in resolving the present dispute.

The commentary explains the purpose behind the statutes:

"The proposed grading scheme takes as its basic rationale the *risk to others* created by the escape. The least risk is presented by persons charged with a misdemeanor or felony who escape from custody prior to incarceration and without resort to force or a deadly weapon. Factors that raise the offense to second degree escape represent additional risk producing elements:

"* * * * *

"(3) The use of force in escapes obviously increases the hazards imposed on those obligated to resist such conduct."

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 190-192, 194-195 (July 1970) (emphasis in original).[7]

That commentary is instructive in that it indicates that the legislature, in grading and enhancing the penalties

[7] The commentary notes that the language "escaping from custody" in ORS 162.155(1)(a) "is not intended to imply that coverage is provided for acts characteristic of an inchoate crime * * *. 'Escaping' means that the actor has actually effected an escape." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 190-192, 195 (July 1970). Thus, the commentary confirms that the use of force while attempting to escape is not itself second-degree escape, but, instead, is merely an attempted second-degree escape.

for second-degree escape, was concerned with the risk of violence associated with the circumstances of the escape. Nevertheless, although instructive, the commentary is hardly conclusive.

Because the legislative history is inconclusive, we must proceed to *PGE*'s "third level." At that level, two interrelated maxims of construction aid in resolving this case: First, we are to construe the language of a statute in a manner consistent with its purpose. *Welliver Welding Works v. Farmen*, 133 Or App 203, 210, 890 P2d 429 (1995). Second, in resolving statutory ambiguities at *PGE*'s third level, we attempt to discern what the legislature *"would have* intended had it considered th[e] problem." *State v. Abdelrasul*, 111 Or App 276, 279, 826 P2d 58 (1992) (emphasis in original).[8] "In conducting that [second] inquiry, we are guided by what the legislature or the courts have identified as the broader purpose of the statute." *Godfrey v. Fred Meyer Stores*, 202 Or App 673, 689, 124 P3d 621 (2005), *rev den*, 340 Or 672 (2006). Therefore, in applying both of those maxims, the legislative history, even though not dispositive at *PGE*'s second level, may be highly probative.[9]

---

[8] In *Abdelrasul*, we employed that maxim in an analogous case. There, *former* ORS 647.125(2) (1985), *repealed by* Or Laws 1999, ch 722, § 9, gave the trial court authority to seize counterfeit marks determined "in any prosecution" to be counterfeit. We concluded that the phrase "in any prosecution" was ambiguous with regard to the time period intended by the term "prosecution." Specifically, we were concerned with whether the trial court was permitted to make the determination before the entry of judgment but after a jury verdict. After demonstrating that the legislative history did not resolve the ambiguity, we addressed what the legislature would have done had it considered the issue. *Abdelrasul*, 111 Or App at 279.

We and the Supreme Court have applied the third-level "potential legislative purpose" maxim in a variety of other cases to resolve ambiguities in statutory language. *See, e.g., State v. Tannehill*, 341 Or 205, 210-12, 141 P3d 584 (2006) (construing the ambiguous term, "the plea," in ORS 135.335(3)); *Carlson v. Myers*, 327 Or 213, 225-26, 959 P2d 31 (1998) (construing the phrase, "to avoid confusion," in ORS 250.035(6)); *Vickers/Nelson & Assoc. v. Environ. Quality Comm.*, 209 Or App 179, 189, 148 P3d 917 (2006) (construing the phrase, "operator of a facility," in ORS 468A.715(1)); *Godfrey v. Fred Meyer Stores*, 202 Or App 673, 689, 124 P3d 621 (2005), *rev den*, 340 Or 672 (2006) ("In evaluating competing plausible interpretations of a statute, we are counseled to adopt the construction that is the one closest to what we anticipate the legislature would have intended us to adopt had it confronted the matter.").

[9] *See Linn-Benton-Lincoln Ed. v. Linn-Benton-Lincoln ESD*, 163 Or App 558, 570 n 8, 989 P2d 25 (1999) ("It is appropriate to allude to legislative history at the third level of the *PGE* analysis. *See Windsor Ins. Co. v. Judd*, 321 Or 379, 387-88, 898 P2d 761 (1995). Although the legislative history cited here is not clear enough,

As shown above, the legislature's purpose in creating a grading scheme was to increase the penalties for escaping when "additional risk producing elements" are present. Among those "risk producing elements" is the use of physical force endangering law enforcement personnel and members of the public. We are convinced that the legislature would not have differentiated between the risk associated with using force to begin an escape and the risk associated with using force to continue an escape with law enforcement officers in hot pursuit. More concretely, or graphically, we do not believe that the legislature intended to distinguish between the circumstances in which (1) a person in custody uses physical force in order to break free and is recaptured after a pursuit of 75 yards; (2) a person in custody breaks free without the use of physical force and, with the officer in immediate pursuit, assaults the officer and, thus, is able to get away; and (3) a person in custody breaks free without the use of physical force and, with the officer in immediate pursuit, assaults the officer in an effort to get away but is unable to do so. In each instance, the "risk to others"—and, particularly, to law enforcement personnel—is essentially the same.

Thus, we conclude that the legislature, had it considered the issue, would have intended "escaping" to encompass ongoing, continuous conduct that extends at least during the immediate pursuit of the escapee. In short, the use of physical force at any time during a single continuous course of "escaping," as so understood, is sufficient to constitute second-degree escape.

Here, defendant left Myers's restraint and control without the use of force. He traveled 50 to 75 yards with Myers in hot pursuit the entire time. Defendant's use of force took place in the heat of that continuous course of conduct and before Myers was able to regain control of defendant. Under those circumstances, the trial court correctly denied defendant's MJOA.

Affirmed.

---

standing alone, to allow us to render a decision at the second level, in combination with *Welliver Welding Works*'s maxim of statutory construction, we find its guidance useful.").