Argued and submitted January 26, 2007, affirmed March 19, 2008

David SCHMIDT,
*Plaintiff-Appellant,*
*and*

N. M.,
*Plaintiff,*

*v.*

ARCHDIOCESE OF PORTLAND IN OREGON,
an Oregon corporation;
Roman Catholic Archbishop of Portland in Oregon,
dba Archdiocese of Portland in Oregon
and Roman Catholic Archbishop of Portland in Oregon,
and successors,
a corporation sole;
Mt. Angel Abbey,
an Oregon not for profit corporation
and Louis Charvet,
*Defendants-Respondents,*

*and*

SWISS-AMERICAN CONGREGATION
OF THE ORDO SANCTI BENEDICTI,
*Defendant.*

Multnomah County Circuit Court
020403531; A124850

180 P3d 160

Erin K. Olson argued the cause for appellant. On the opening brief was David Slader. On the reply brief were David Slader, Kelly W.G. Clark, Kristian Roggendorf, and O'Donnell & Clark LLP.

James N. Finn argued the cause for respondent Archdiocese of Portland and Roman Catholic Archbishop of Portland in Oregon. On the brief were Thomas Dulcich,

Margaret Hoffmann, Sara Kobak, and Schwabe, Williamson & Wyatt, P.C.

John T. Kaempf argued the cause for respondent Mt. Angel Abbey and Louis Charvet. With him on the brief were Richard J. Whittemore and Bullivant Houser Bailey P.C.

Before Ortega, Presiding Judge, and Edmonds and Armstrong, Judges.

ORTEGA, P. J.

Edmonds, J., concurring in part and dissenting in part.

## ORTEGA, P. J.

Plaintiff initiated an action in tort against the Catholic Archdiocese of Portland, Mt. Angel Abbey, and Charvet, a former priest at the abbey.[1] The action was based on plaintiff's allegations that Charvet masturbated in his presence on one occasion during plaintiff's freshman year of high school at Mt. Angel Seminary and that another priest, Frank, who is now deceased, sexually assaulted him when he was seven or eight years old. Plaintiff sought to hold Charvet directly liable for his conduct and to hold the archdiocese and the abbey vicariously liable for both priests' conduct under the doctrine of *respondeat superior*.

Defendants moved for summary judgment, and the trial court granted the motions, concluding that the extended statute of limitations provided in ORS 12.117[2] for actions constituting "child abuse" did not apply to Charvet's conduct and that neither priest's conduct was within the scope of his employment so as to provide a basis for vicarious liability on the part of the archdiocese and the abbey. Plaintiff now appeals, contending that issues of fact and law precluded summary judgment. We affirm.

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. On review of the grant of summary judgment, we state the facts and all reasonable inferences that may be drawn from them in favor of the non-moving party—in this case, plaintiff. ORCP 47 C; *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 455, 31 P3d 421 (2001).

The summary judgment record includes the following facts. Plaintiff was raised in a Roman Catholic family in the town of Mt. Angel. The family regularly attended mass at St. Mary's Church, which was on the same street as, and several properties away from, their home. Mt. Angel Abbey, a Benedictine monastery and seminary, is located in

---

[1] Another defendant was dismissed at an early stage of the proceeding and is not a party to this appeal.

[2] This and other relevant statutes are set out in the discussion below.

Mt. Angel. By agreement with the archdiocese, priests from the abbey often staffed St. Mary's Church.

One day in the early 1950s, when plaintiff was seven or eight years old, he, two of his siblings, and several friends were roller skating on the sidewalk around St. Mary's Church when plaintiff fell down and scraped his knees. According to plaintiff, Frank, "dressed like a priest," was walking nearby. Frank walked over to where plaintiff had fallen, helped plaintiff up, took him by a nearby stairway into the basement of the church, sat him on a table, and asked him to "take [his] pants down to look at [his] scraped knees." According to plaintiff, Frank looked at plaintiff's scraped knees, then began fondling plaintiff's penis through his underwear and, ultimately, sodomized him.

Some years later, plaintiff attended Mt. Angel Seminary for his freshman year of high school. Charvet was a freshman advisor and dormitory proctor. Plaintiff testified that, early in the second semester of his freshman year—that is, in January or February 1958—Charvet asked plaintiff to meet him at a specified time in Charvet's office, which was located at the end of plaintiff's dormitory. When plaintiff arrived at the office, Charvet was sitting behind a desk. The office was large and had a "normal" level of lighting. While plaintiff was in the office, the door was closed; plaintiff did not know whether it was locked. Charvet, wearing a cassock and scapular, instructed plaintiff to stand in front of the desk and began asking him what he knew about sexuality and reproduction. Among other topics, Charvet asked plaintiff whether he had ever masturbated and began explaining "what that was about."

Plaintiff testified that, during that discussion, "I could see that there was a lot of motion going on under [Charvet's] cassock and I assumed what I was seeing was he was masturbating and it became frightening to me and I left—I just mentally left the room." Plaintiff did not know whether Charvet's hand was touching his skin, did not see Charvet's genitals, and did not see Charvet's hand on his penis; he concluded that Charvet was masturbating based on the "motion" that he saw and the fact that "[i]t went on for a long time," "[m]aybe ten minutes." Plaintiff also testified

that, although he did not know if Charvet ever "achieved some form of climax," Charvet "became very distracted in what he was doing to himself." Plaintiff believed that it was "obvious" what Charvet was doing. He testified that Charvet did not "proposition" him to participate in what Charvet was doing, did not touch him, and did not ask him to do the same thing. Plaintiff testified that, although Charvet did not prevent him from leaving the office, his own "training" did. Plaintiff testified that he never had any further "incidents" of that kind involving Charvet and that he never told anyone at the school, at Mt. Angel Abbey, or at any church about the incident, because he did not think that doing so "would do much good."

In February 1999, plaintiff began seeing a mental health counselor, English. Some time after that, he remembered the incidents involving Frank and Charvet.

In April 2002, plaintiff initiated this action against, as pertinent here, Charvet, the archdiocese, and the abbey. In his operative complaint, plaintiff alleged two claims for relief: a claim for sexual battery based on Frank's alleged sexual assault and a claim for intentional infliction of emotional distress and for breach of fiduciary duty based on the theory that Charvet sexually abused plaintiff by masturbating in his presence. Plaintiff sought economic damages in the amount of $150,000 for costs of counseling and psychological treatment and noneconomic damages in the amount of $4 million. In its answer, the archdiocese denied the relevant factual allegations and asserted, among other affirmative defenses, that plaintiff's claims are barred by the applicable statutes of limitation and are not subject to ORS 12.117, which provides for an extended limitations period for actions based on child abuse. The archdiocese also contended that, to the extent that ORS 12.117 does apply, it is unconstitutional in various respects. Charvet and the abbey also denied the relevant factual allegations and asserted a limitations defense, among other affirmative defenses.

As noted, defendants moved for summary judgment. As pertinent here, in support of its motion, the archdiocese contended that Frank's conduct was not within the scope of employment for the purposes of vicarious liability because, as

demonstrated by the summary judgment record, the alleged sexual abuse occurred within minutes of plaintiff's first-ever encounter with Frank and, accordingly, there was no evidence that Frank used or manipulated a position of trust to ingratiate himself with plaintiff or to create an opportunity to sexually abuse him, as occurred in *Fearing v. Bucher*, 328 Or 367, 977 P2d 1163 (1999). In support of its parallel motion, the abbey likewise argued that plaintiff's deposition testimony was insufficient to demonstrate that plaintiff had the requisite prior relationship or contact with Frank or Charvet for purposes of *respondeat superior* liability. Charvet contended that plaintiff's testimony was insufficient to demonstrate that he ever touched plaintiff or propositioned him to engage in any sexual activity in a manner that would constitute child abuse as defined in ORS 12.117.

In opposition, relying on *Chesterman v. Barmon*, 305 Or 439, 753 P2d 404 (1988), plaintiff argued that the required causal connection between the priests' employment and plaintiff's injuries need not be demonstrated by evidence of so-called "grooming" conduct by the priests. According to plaintiff, there is sufficient alternative evidence relating to Frank's and Charvet's priestly functions and duties and the relationship generally between priests and parishioners to demonstrate that the priests' actions toward plaintiff were an outgrowth of, and were engendered by, conduct that was within the scope of their employment. Plaintiff also contended that the definition of child abuse in ORS 12.117 includes both "sexual exploitation" and "cruelty," that neither of those standards requires physical contact with the child, and that Charvet's conduct of masturbating in plaintiff's presence therefore was not excluded from that definition.

The archdiocese replied that Frank's status as a Catholic priest standing alone was insufficient to show that he was acting within the scope of his employment; that there was no evidence that, around the time of the incident involving Frank, plaintiff was involved in any church-related activities such as serving as an altar boy; and that holding the archdiocese vicariously liable based solely on Frank's religious status would violate the religion clauses of the state and federal constitutions. Relying on *Conger v. Dant & Russell,*

*Inc.*, 250 Or 480, 443 P2d 201 (1968), and related cases, the abbey and Charvet replied in part that plaintiff's deposition testimony that he "assumed" that Charvet had been masturbating in his presence was inadmissible speculation and therefore was insufficient to allow a jury to find that Charvet had in fact engaged in that conduct. The abbey and Charvet also contended that, even assuming that Charvet was masturbating during the encounter, that conduct was not "child abuse" within the definition of ORS 12.117. Finally, they argued that plaintiff's contention that, in effect, all Catholics are "groomed" by all Catholic priests as a matter of Catholic doctrine amounted to a theory of strict liability that failed as a matter of law.

After a hearing, the trial court concluded that Charvet's alleged conduct of masturbating in plaintiff's presence did not constitute "child abuse" as defined in ORS 12.117 and that, accordingly, plaintiff's claims of direct and vicarious liability based on that conduct were time-barred. The trial court also concluded that neither the alleged conduct of Frank nor that of Charvet was sufficient, under *Fearing*, to support *respondeat superior* liability on the part of the priests' employers. The court therefore granted summary judgment in favor of all defendants on plaintiff's claims involving both Frank and Charvet.

As noted, on appeal, plaintiff asserts three assignments of error. In his first and second assignments, he contends that the trial court erred in determining that there was insufficient evidence to submit to the jury the question of vicarious liability of the archdiocese and the abbey for the conduct of Frank and Charvet. In his third assignment of error, he argues that the trial court erred in determining that Charvet's conduct was not subject to the extended statute of limitations in ORS 12.117 and in dismissing the relevant claims as time-barred.

Because it is dispositive of plaintiff's claims based on Charvet's conduct, we begin with his third assignment of error, pertaining to the applicability of the extended limitations period provided by ORS 12.117. Plaintiff first contends that a jury could find that Charvet's action of masturbating in front of a student constituted "cruelty to [a] child" within

the meaning of ORS 12.117(2)(a)(B) because, according to plaintiff, consistently with the plain meaning of the word "cruel," the statutory term "cruelty" encompasses acts that cause significant psychic injury to a child and that are performed with a mental state of indifference to such injury. Second, plaintiff argues that a jury could find that Charvet's conduct constituted "sexual exploitation" of plaintiff within the meaning of ORS 12.117(2)(d) because his conduct was sexual in nature and, by engaging in it, he unethically used plaintiff for selfish purposes; plaintiff contends that masturbating in the presence of a child constitutes "sexual exploitation" as a matter of common sense. Plaintiff further notes that the legislature provided a nonexclusive list of examples of "sexual exploitation"—child pornography and prostitution—and that, like the activity of masturbating in front of a child, those activities as defined do not necessarily require sexual contact. Plaintiff also points to the definitions of "child abuse" in ORS 419B.005 and ORS 163.665, which, he contends, provide contextual support for his proposed interpretation of the phrase in ORS 12.117.

The abbey and Charvet respond that the trial court ruled correctly for two reasons.[3] First, they contend, even assuming that Charvet's alleged conduct was child abuse within the meaning of ORS 12.117, plaintiff produced no admissible evidence of that conduct. Rather, the only evidence germane to that issue was plaintiff's inadmissible "assumption" or "mere speculation" that Charvet was masturbating in front of him, evidence that defendants assert is insufficiently specific to create an issue of fact to preclude summary judgment.

Alternatively, the abbey and Charvet contend that, as a matter of statutory construction, and even assuming that there is admissible evidence that Charvet was masturbating in front of plaintiff, that conduct did not constitute "child abuse" within the meaning of ORS 12.117. According to defendants, the text and context of the statute demonstrate that it applies to conduct involving an adult sexually touching a child, a child sexually touching an adult, or a child

---

[3] The archdiocese makes no separate response to plaintiff's third assignment of error.

performing sexual activities that are observed by others, but not to conduct involving an adult touching himself. Here, where Charvet did not physically contact plaintiff and plaintiff himself did not engage in any sexual conduct, the conduct alleged did not constitute either "cruelty to a child" as provided in ORS 12.117(2)(a)(B) or "sexual exploitation of a child" as provided in ORS 12.117(2)(d)(A).

Plaintiff replies that, where he testified to seeing movement under Charvet's cassock that "went on [for] a long time" while Charvet was talking about masturbation, that evidence was not speculative; rather, a jury reasonably could infer from his testimony that Charvet was masturbating.

We begin by determining the meaning of the relevant provisions of ORS 12.117 as a legal matter. We do so according to the familiar principles of statutory construction enunciated in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), beginning with the text and context of the relevant provision, then considering, if necessary, the provision's legislative history and relevant maxims of construction. We then consider whether there is evidence in the record from which a jury could reasonably find or infer that Charvet's conduct met the determined legal standards.

ORS 12.117 provides:

"(1) Notwithstanding ORS 12.110, 12.115 or 12.160, an action based on conduct that constitutes child abuse or conduct knowingly allowing, permitting or encouraging child abuse accruing while the person who is entitled to bring the action is under 18 years of age shall be commenced not more than six years after that person attains 18 years of age, or if the injured person has not discovered the injury or the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the injury or the causal connection between the injury and the child abuse, not more than three years from the date the injured person discovers or in the exercise of reasonable care should have discovered the injury or the causal connection between the child abuse and the injury, whichever period is longer.

"(2)  As used in subsection (1) of this section, 'child abuse' means any of the following:

"(a)  *Intentional conduct by an adult that results in*:

"(A)  Any physical injury to a child; or

"(B)  *Any mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child*;

"(b)  Rape of a child, which includes but is not limited to rape, sodomy, unlawful sexual penetration and incest, as those acts are defined in ORS chapter 163;

"(c)  Sexual abuse, as defined in ORS chapter 163, when the victim is a child; or

"(d)  *Sexual exploitation of a child, including but not limited to*:

"(A)  *Conduct constituting violation of ORS 163.435 and any other conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact*; and

"(B)  Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167.

"(3)  Nothing in this section creates a new cause of action or enlarges any existing cause of action."

(Emphases added.)

We first consider the meaning of ORS 12.117(2)(a)(B). That subsection includes within the category of "child abuse" that is subject to the extended limitations period of ORS 12.117(1) "[i]ntentional conduct by an adult that results in * * * [a]ny mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child." Specifically, we address the meaning of the disputed phrase "cruelty to the child."[4]

___

[4] The parties do not dispute that, to the extent Charvet engaged in the conduct alleged, he did so intentionally. In addition, plaintiff produced evidence of the

The noun "cruelty," although not defined in the statute, is defined in the dictionary, in part, as "the quality or state of being cruel : disposition to inflict pain or suffering or to enjoy its being inflicted : INHUMANITY." *Webster's Third New Int'l Dictionary* 546 (unabridged ed 2002). In addition, it indicates "a cruel action : inhuman treatment." *Id*. The adjective "cruel" means, in part, "disposed to inflict pain esp. in a wanton, insensate, or vindictive manner : pleased by hurting others : SADISTIC : devoid of kindness" or "arising from or indicative of an inclination to enjoy another's pain or misfortune."[5] *Id*. It also means "causing or conducive to injury, grief, or pain ‹a [cruel] struggle for existence›" and "SEVERE, DISTRESSING : extremely painful : EXTREME." *Id*.

It is apparent that the phrase "cruelty to the child" has several possible meanings. We first consider whether the term "cruelty" as used in ORS 12.117(2)(a)(B) denotes a mental state of the perpetrator of the conduct at issue—specifically, that the perpetrator has a "disposition" to enjoy inflicting pain or hurting others—or whether it describes the nature of the conduct itself—that the conduct "caus[es]" or is "conducive to" injury, grief, or pain. The quoted definitions of cruelty support both of those interpretations. However, we do not consider the phrase "cruelty to the child" in isolation. *See To v. State Farm Mutual Ins.*, 319 Or 93, 99, 873 P2d 1072 (1994) (the court does not consider a phrase in isolation but considers it in the context of the statutory provision as a whole). Considered as a whole, ORS 12.117—which applies to "action[s] based on conduct that constitutes child abuse," ORS 12.117(1), and which defines "child abuse" in relevant part, in terms of "conduct," ORS 12.117(2)—suggests a general emphasis on the act performed, rather than on the mental state of the perpetrator.

■ A provision of the juvenile code, ORS 419B.504, supports that interpretation. That provision provides for termination of parental rights based on, among other things,

---

existence of a mental injury. Thus, the parties' dispute focuses on the requirement that the injury be "caused by cruelty to the child."

[5] The adjective "disposed" means, in this context, "having a particular temperament, disposition, or tendency or being of a particular frame of mind." *Webster's* at 654. The adjective "inclined" means "having inclination, disposition, or tendency." *Id*. at 1143.

"[c]onduct toward any child of an abusive, cruel or sexual nature." ORS 419B.504(2). The fact that the legislature used the adjective "cruel" specifically to modify "conduct" toward children in ORS 419B.504(2) suggests that the legislature intended the word "cruelty" in ORS 12.117(2) to refer to a type of conduct rather than to the mental state of the perpetrator.[6] Accordingly, based on the text and context of ORS 12.117(2)(a)(B), we conclude that the phrase "cruelty to the child" refers to a type of conduct, not to the disposition or mental state of the perpetrator of the conduct.

We next consider the precise nature of such conduct. To recall, as relevant to conduct, the noun "cruelty" means "a cruel action : inhuman treatment." The adjective "cruel" means "severe, distressing : extremely painful : extreme." The adjective "inhuman" means, in part, "lacking the qualities of mercy, pity, kindness, or tenderness : CRUEL, BARBAROUS, SAVAGE." *Webster's* at 1163. Those definitions strongly suggest that, in using the word cruelty, the legislature intended to encompass conduct of a relatively severe or extreme nature.

Next, assuming that the legislature intended to refer to relatively extreme conduct, we consider whether such conduct can be of any type, such as physical, verbal, or sexual, or whether it encompasses only particular types. The text of ORS 12.117(2)(a)(B) is silent regarding that issue, and the plain meaning of "cruelty," discussed above, also provides no guidance. The context of ORS 12.117(2)(a)(B) provides some guidance, however. As quoted above, ORS 12.117(2)(a)(A) pertains to intentional conduct that results in physical injury to a child; accordingly, we infer that the legislature did not intend for ORS 12.117(2)(a)(B) to encompass such conduct— although it might well encompass physical conduct that does not result in physical injury. In addition, ORS 12.117(2)(b),

---

[6] Another provision of the juvenile code, ORS 419B.005, defines "abuse" for the purpose of the child abuse reporting statutes, ORS 419B.005 to 419B.050. As pertinent here, ORS 419B.005(1)(a)(B) provides that "abuse" means "[a]ny mental injury to a child, which shall include only observable and substantial impairment of the child's mental and psychological ability to function caused by cruelty to the child, with due regard to the culture of the child." As discussed below, that provision is the source of the language of ORS 12.117(2)(a)(B). As a matter of textual analysis, because the language of the two provisions is virtually identical, neither sheds helpful light on the meaning of the other.

(c), and (d) enumerate various forms of sexual contact with or sexual exploitation of a child, regardless of whether that conduct results in any demonstrable mental or physical injury; we therefore infer that ORS 12.117(2)(a)(B) does not encompass the types of sexual conduct specified in ORS 12.117(2)(b), (c), and (d). Nevertheless, even assuming that ORS 12.117(2)(a)(B) does not include types of conduct addressed elsewhere in the statute, it remains unclear what other types of conduct *are* included.

Finally, the disputed phrase is indefinite in at least one other respect. As noted, the noun "cruelty" means, in part, "a cruel action" or "inhuman treatment." The noun "action" is defined, in part, as "a voluntary act of will that manifests itself externally." *Webster's* at 21. That is, the word "action" may refer to a single event. However, the word "action" also is defined as "the process of change or alteration" and "the process of doing." *Id.* Thus, it also may mean a series of events. Similarly, the noun "treatment" means, in part, "conduct or behavior toward another"; "the action or manner of dealing with something often in a specified way"; and "the techniques or actions customarily applied in a specified situation as **a:** a pattern of actions * * * designed to punish or persuade." *Id.* at 2435. Those definitions also encompass both single events and series of events.

In summary as to our first-level analysis, we are confident that the phrase "cruelty to the child" refers to conduct of a relatively extreme nature. However, it is not clear from the text or context what types of conduct are included in the phrase, such as whether it encompasses conduct that is physical, verbal, or sexual or whether such conduct can consist of a single act or event or must instead constitute a "process" or a "pattern" of behavior—that is, a series of events. Nor, aside from the other provisions of ORS 12.117 discussed above, have we identified any contextual statutes that clarify the intended meaning of "cruelty to the child" in those respects.[7]

---

[7] The dissent posits that ORS 163.575 (1987)—which provided that causing or permitting a minor to witness masturbation, among other conduct, was conduct constituting the crime of endangering the welfare of a minor, and which was in effect at the time the legislature enacted ORS 12.117—demonstrates as a matter of context that the legislature would have understood masturbation in the presence

We therefore turn to the legislative history of ORS 12.117(2)(a)(B).

ORS 12.117 was enacted by the 1989 legislature in response to concerns that ORS 12.160 (which tolls statutes of limitation for persons under 18 years of age, but only for a maximum of five years, or one year after the person turns 18) was insufficient in cases of minors subjected to "child abuse and molestation." As initially introduced, the bill, House Bill (HB) 2668, simply amended ORS 12.160 by extending the tolling period to a maximum of 10 years, three years after the person turned 18 in actions based on assault or battery, or one year after the person turned 18 in all other actions, whichever occurred later. None of the language at issue in this case was present in the original bill. *See* Staff Measure Summary, HB 2668, Mar 20, 1989.

At an early hearing on the bill, after some discussion as to the kind of claims the bill applied to, Representative Mannix suggested that it be amended to apply to claims based on "sexual, physical, or psychological abuse." In turn, Representative Minnis noted that, in 1985, the legislature had amended the definition of "child abuse" in a different statute to include what he referred to as "psychological abuse" and asked whether there were any appellate cases further defining that form of child abuse. The chair of the judiciary committee asked staff to prepare amendments to respond to those concerns. Minutes, House Committee on Judiciary, Civil Law Subcommittee, Mar 20, 1989, 9-10.

---

of a child to be conduct constituting "cruelty to a child" for the purpose of ORS 12.117(2)(a)(B). The dissent acknowledges, however, that other conduct encompassed within the child endangerment criminal statute—which included using controlled substances in the presence of a child, causing or permitting a child to participate in gambling, and selling a child tobacco products or drug paraphernalia—likely would not constitute cruelty, and we do not discern any principle by which we can conclude that masturbation does so. 218 Or App at 704-05 (Edmonds, J., dissenting). In any event, another statute in effect at the time the legislature enacted ORS 12.117 controverts the inference that the dissent draws from ORS 163.575 (1987): Under *former* ORS 419.476 (1987), *repealed by* Or Laws 1993, ch 33, § 373, the juvenile court had jurisdiction of a person under 18 years of age whose circumstances were such as to "endanger the welfare of the person" and a person under 18 years of age whose parents or custodian "subjected the person to cruelty," among other bases for jurisdiction. Properly interpreted, that statute demonstrates that the legislature regarded child endangerment and cruelty to a child as two separate concepts.

In response, committee staff substantially redrafted the bill. Rather than amending ORS 12.160, the redrafted bill added a new section to ORS 12.070 to 12.250. Among other new provisions, the proposed new section, eventually codified as ORS 12.117, defined "child abuse" to include "intentional conduct by an adult that results in * * * [a]ny mental injury to a child." Exhibits, HB 2668, House Committee on Judiciary, Civil Law Subcommittee, Mar 24, 1989, Ex I. At a meeting of the relevant subcommittee, legislators discussed what was meant by that type of conduct and injury. Snyder, a witness representing the Oregon Trial Lawyers Association, noted that the term "child abuse" was defined in the juvenile code. Subcommittee counsel Taylor informed the committee that the then-current child abuse reporting statute, *former* ORS 418.740 (1987), *renumbered as* ORS 419B.005 (1993), defined "child abuse" to include a qualified form of "mental injury"; counsel quoted the relevant language to the committee. Minutes, House Committee on Judiciary, Civil Law Subcommittee, Apr 5, 1989, 6-8.[8] There was no further discussion in the legislature of the "mental injury" form of "child abuse." The language that the legislature ultimately enacted as the "mental injury" component of ORS 12.117 was substantially identical to that found in *former* ORS 418.740.

Because the disputed language in ORS 12.117 derived almost verbatim from *former* ORS 418.740, and because the 1989 legislature apparently did not reconsider in any detail the intended meaning of that language, we also consider the legislative history of *former* ORS 418.740—specifically, the 1985 amendments to that statute that introduced the relevant text.

The amendments were requested by what was then the Children's Services Division (CSD) of what was then the Department of Human Resources. The purpose of the amendments was to bring Oregon's child abuse reporting statute

---

[8] Specifically, at that time, *former* ORS 418.740 qualified mental injury as including "only observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child."

into compliance with federal requirements for receipt of federal funding. Staff Measure Analysis, HB 2160-A-E, Senate Judiciary Committee, May 30 and June 4, 1985. However, as originally introduced, the relevant bill (HB 2160) did not include any reference to mental injury. Rather, it defined reportable "child abuse" in terms of intentional physical injury to a child; neglect, "which leads to physical harm"; and various types of sexual conduct.

During the legislative session, CSD requested that the bill also include intentional conduct resulting in mental injury to a child. According to materials submitted by several witnesses, the concept of "mental injury" or "emotional maltreatment" of children was relatively new and was intended to capture "parental acts or omissions" that result in "harm or threatened harm to the child." The submitted materials included excerpts from a Draft Model Child Protection Act, which employed four criteria for identifying emotionally maltreated children. The first criterion pertained to the conduct of the parent or caretaker, as opposed to the resulting symptoms or effects on the child; the relevant conduct was described as a *pattern of behavior* that has an EFFECT on the child." Exhibits, House Committee on Judiciary, HB 2160, Mar 20, 1985, Ex B, C (italics added; capitalization in original). The language originally suggested by the proponents to define "mental injury" did not include any reference to "cruelty," however. *Id.* at Ex B; *see also* Exhibits, Senate Judiciary Committee, HB 2160, June 6, 1985, Ex L.

During the floor debate preceding passage of HB 2160 out of the House, Representative Kopetski explained that the bill expanded the definition of child abuse to include "mental abuse"; in response to a question from Representative Minnis, Representative Kopetski stated that "mental injury" was intended to encompass "something beyond a stress level" that created "a dysfunction of mental ability." The remainder of the floor debate pertaining to HB 2160 focused on other issues.

The bill then went to the Senate. At a hearing of the Senate Judiciary Committee, committee members discussed in detail the intended scope of the "intentional conduct resulting in mental injury" form of child abuse, particularly

the need for a causal relationship between the actor's conduct and such injury. To address that concern, two witnesses, Multnomah County Juvenile Court Judge Herrell and Multnomah County Deputy District Attorney Meisenheimer, suggested that mental injury be defined as "*an act or acts of cruelty to a child* which results in an observable and substantial impairment of the child's mental or psychological ability to function within the child's normal range of performance and behavior with due regard to the child's culture." (Emphasis added.) Meisenheimer noted that "cruelty" was one of the grounds for juvenile court dependency jurisdiction. Committee Chair Senator Frye opined that the latter usage included mental cruelty such as acts of "depravity" not involving physical cruelty. Several committee members agreed that the quoted definition was intended to include nonphysical conduct on the part of the perpetrator. As examples, Senator Hendriksen mentioned shouting at a child "every day" or "constantly" disparaging a child. Minutes, Senate Judiciary Committee, June 6, 1985, 23-24.

Later in the hearing, in order to further emphasize the need for a cause-and-effect relationship between conduct constituting cruelty and the resulting mental injury, the committee moved the language pertaining to "cruelty" to the end of the "mental injury" provision. The committee also omitted the words "an act or acts." Thus, the committee ultimately agreed to qualify "mental injury" as including "only observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child." At the conclusion of the hearing, Senator Wyers noted that he was "comfortable" with the use of the word "cruelty" based on the examples previously given, such as "screaming repeatedly" at a child "in a very extreme way" and other "traumatizing" conduct, as opposed to mere "shouting" at children "occasionally." *Id.* at 25-26; Tape Recording, Senate Judiciary Committee, HB 2160, June 6, 1985, Tape 175, Side B (statement of Sen Jan Wyers). During the Senate floor debate, Senator Wyers reiterated that the category pertaining to intentional conduct resulting in mental injury was intended to capture "abuse that does not actually cause physical, observable

physical damage to [children], such as repeatedly screaming at a child at very close range." Tape Recording, Senate Floor Debate, HB 2160, June 12, 1985, Tape 185, Side A (statement of Sen Jan Wyers).

For unrelated reasons, the bill was then referred to a conference committee.[9] At a meeting of the committee, a witness from CSD expressed concern that the word "cruelty" in the "mental injury" provision was too "narrow" and would fail to capture other conduct that could cause such injury to a child, such as failure to stimulate, guide, or praise a child. Minutes, Conference Committee on HB 2160, June 17, 1985, 6, 8-11; *see also* Minutes, Conference Committee on HB 2160, June 17, 1985, Ex A, B. Senator Frye responded that the purpose of the phrase "caused by cruelty to the child" was to emphasize the requirement of a causal relationship between the actor's conduct and the resulting mental injury, and Senator Hendrikson noted that the word "cruelty" was intended to refer to a narrow range of conduct. Minutes, Conference Committee on HB 2160, June 17, 1985, 9-10. The committee therefore retained the language proposed in the Senate Judiciary Committee and passed the bill out of the Senate.

Following consideration in the conference committee, HB 2160 was repassed by the House and Senate. In the House floor debate preceding repassage, Representative Springer explained that, after the bill's original passage by the House, the Senate had "narrowed significantly" the definition of what he referred to as "mental abuse" and that the conference committee had retained that language. House Floor Debate, HB 2160, June 19, 1985, Reel 26, Track I. The Senate floor debate preceding repassage did not include any discussion of the "mental injury" provision. Senate Floor Debate, HB 2160, June 20, 1985, Tape 230, Side A.

The legislative history of *former* ORS 418.740 sheds additional light on the meaning of ORS 12.117(2)(a)(B) in several significant respects. First, it demonstrates that the

---

[9] HB 2160 was referred to a conference committee after the House refused to concur in Senate amendments relating to methods of obtaining the testimony of children under age 12, such as by use of closed circuit television. Those provisions ultimately were deleted.

phrase "cruelty to the child" was intended to refer to a "narrow" range of conduct.[10] Second, it confirms that the phrase was intended to refer to relatively severe or extreme conduct toward a child. Finally, the examples given by members of the Senate Judiciary Committee of the type of conduct with which the legislature was concerned—such as shouting at a child "every day," "constantly" disparaging a child, and "screaming repeatedly," as opposed to "occasionally," at a child—discloses that the phrase "cruelty" was intended to refer, at least most typically, to verbal conduct that, moreover, occurs repeatedly or that forms a "pattern" of abusive behavior.

Nevertheless, the legislative history of *former* ORS 418.470 does not conclusively demonstrate that those types of conduct were the only types that fall within the ambit of the disputed phrase. That is, although the legislative history sheds some additional light on the meaning of the phrase "cruelty to the child" in ORS 12.117(2)(a)(B), it does not, in our view, definitively delineate the entire universe of such conduct. We therefore turn to the third level of statutory interpretation, in which we apply relevant maxims of construction. *PGE*, 317 Or at 612. We recently explained our deployment of two relevant maxims in *State v. Lonergan*, 210 Or App 155, 164, 149 P3d 1215 (2006), *rev'd on other grounds*, 344 Or 15, 176 P3d 374 (2008):

> "[T]wo interrelated maxims of construction aid in resolving this case: First, we are to construe the language of a statute in a manner consistent with its purpose. *Welliver Welding Works v. Farmen*, 133 Or App 203, 210, 890 P2d 429 (1995). Second, in resolving statutory ambiguities at *PGE*'s third level, we attempt to discern what the legislature '*would have* intended had it considered th[e] problem.' *State v. Abdelrasul*, 111 Or App 276, 279, 826 P2d 58 (1992) (emphasis in original). 'In conducting that [second] inquiry, we are guided by what the legislature or the courts have identified as the broader purpose of the statute.' *Godfrey v. Fred Meyer Stores*, 202 Or App 673, 689, 124 P3d 621

---

[10] The dissent postulates that, because *former* ORS 418.740 in its entirety encompassed a broad range of conduct, the provision relating to mental injury caused by cruelty to a child also should be given a broad meaning. 218 Or App at 702-04 (Edmonds, J., dissenting). We disagree with that reasoning; in any event, the described legislative history is to the contrary.

(2005), *rev den*, 340 Or 672 (2006). Therefore, in applying both of those maxims, the legislative history, even though not dispositive at *PGE*'s second level, may be highly probative."

(Brackets in original; footnotes omitted.) *See also Godfrey*, 202 Or App at 689 ("In evaluating competing plausible interpretations of a statute, we are counseled to adopt the construction that is the one closest to what we anticipate the legislature would have intended us to adopt had it confronted the matter."); *Linn-Benton-Lincoln Ed. v. Linn-Benton-Lincoln ESD*, 163 Or App 558, 570 n 8, 989 P2d 25 (1999) ("It is appropriate to allude to legislative history at the third level of the *PGE* analysis. Although the legislative history cited here is not clear enough, standing alone, to allow us to render a decision at the second level, in combination with [the maxim that we construe a statute consistently with its purpose], we find its guidance useful.").

In applying those maxims here, we also note our awareness that, to the extent legislative history provides guidance, in this case, that guidance derives primarily from the history of *former* ORS 418.740 rather than from the history of ORS 12.117 itself. Nevertheless, we believe that those related statutes—the former of which pertains to reporting child abuse, and the latter of which establishes an extended limitations periods for bringing actions based on child abuse—are sufficiently directed at the same legislative purposes and intentions so as to permit us to consider the histories of both at the third level of construction, as we did at the second level. *See PGE*, 317 Or at 611 (where the legislature uses the same term in related statutes, the court infers that the term has the same meaning); *Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 141, 20 P3d 837, *rev den*, 332 Or 518 (2001) (same).

The primary purpose of each statute is, of course, the protection of children from abuse. Nevertheless, as both the statutes themselves and their histories disclose, neither statute has unlimited scope. Indeed, it is apparent to us that the legislature made a significant effort to enact specific, detailed criteria giving rise to, respectively, the obligation to report child abuse and the entitlement to an extended limitations

period. In particular, as pertinent here, it is clear that the legislature intended the word "cruelty" to refer to a narrow range of extreme or severe conduct.

■    Taking into account both the legislature's overall purpose in enacting ORS 12.117 and, at the same time, its careful calibration of the reach of that statute—demonstrated by its detailed description of the various kinds of conduct subject to the extended limitations period—we conclude that the conduct at issue here does not meet the standard established by ORS 12.117(2)(a)(B). As discussed above, plaintiff testified that, while Charvet was sitting behind his desk in his office, he questioned plaintiff, a freshman in high school, about his knowledge of sexuality and reproduction. During that discussion, plaintiff saw "motion" under Charvet's cassock. Plaintiff did not see whether Charvet's hand was touching his skin, did not see Charvet's genitals, did not see Charvet's hand on his genitals, and did not perceive Charvet achieving any form of sexual climax. Plaintiff also testified that Charvet did not "proposition" plaintiff to participate in any way, did not touch plaintiff, did not ask plaintiff to do the same thing, and did not prevent plaintiff from leaving Charvet's office; to the contrary, plaintiff testified that, during the incident, Charvet "became very distracted in what he was doing to himself." In other words, the conduct alleged here was essentially surreptitious and, although plaintiff was present, it did not directly involve him. Moreover, given that plaintiff alleges that Charvet's conduct of masturbating in his presence occurred on only one occasion, lasting approximately 10 minutes, the conduct did not occur as part of a "pattern" of abuse—a circumstance that logically can transform even less-severe conduct into conduct that is injurious to the extent contemplated by ORS 12.117(2)(a)(B). In short, even assuming that intentional conduct resulting in mental injury "caused by cruelty to the child" as provided in ORS 12.117(2)(a)(B) includes sexual conduct that is not addressed in other portions of the statute—as we believe best effectuates the purpose of the statute as a whole—and even assuming as a logical matter that it includes single incidents as well as patterns of behavior, we conclude that, had the legislature considered the specific conduct alleged by plaintiff here, it would not have deemed

the incident to be the kind of extreme or severe conduct constituting "cruelty to the child" for the purpose of ORS 12.117(2)(a)(B). It follows that there was insufficient evidence from which the jury could conclude that Charvet's conduct was subject to the extended limitations period in that statute.[11]

■    We turn to whether plaintiff's claim based on Charvet's conduct was subject to an extended limitations period under ORS 12.117(2)(d), providing for such extension for claims based on conduct constituting "sexual exploitation of a child." The statute does not directly define the quoted term; rather, it sets out a nonexclusive list of activities that the term "includes." In that circumstance, we construe the statute to refer only to conduct of the same type as the listed activities. *See Liberty v. State Dept. of Transportation*, 342 Or 11, 20, 148 P3d 909 (2006) (when a statute uses a general phrase and a nonexclusive list of items, under the principle of *ejusdem generis*, the court construes the statute as referring only to other items of the same kind as the listed items). In performing that task, we examine the "basic characteristics" of the enumerated items. *Lewis v. CIGNA Ins. Co.*, 339 Or 342, 350, 121 P3d 1128 (2005).

We first examine the basic characteristics of the forms of activity enumerated in ORS 12.117(2)(d)(A). One of those forms is conduct constituting a violation of ORS 163.435, which provides that a person 18 years of age or older commits the crime of contributing to the sexual delinquency of a minor if the person engages in sexual intercourse or deviate sexual intercourse with a person of the opposite sex under 18 years of age or causes a person under 18 years of age to engage in deviate sexual intercourse. A "basic characteristic" of those activities is sexual intercourse—that is, actual sexual contact—between the perpetrator and the victim. *See* ORS 163.305(6) (defining "sexual contact" as "any touching of the sexual or intimate parts of a person or causing such person to touch the sexual or intimate parts of the actor for the

---

[11] We emphasize that we do not hold that masturbating in the presence of a child on one or multiple occasions can never constitute "cruelty to the child" for the purpose of ORS 12.117(2)(a)(B). We hold only that, on this record, the incident alleged here does not meet that standard as we have construed it.

purpose of arousing or gratifying the sexual desire of either party"); ORS 163.305(7) (sexual intercourse "has its ordinary meaning and occurs upon any penetration"). The record in this case contains no evidence of such conduct by Charvet; accordingly, that portion of ORS 12.117(2)(d)(A) is not applicable.

Next, under ORS 12.117(2)(d)(A), "sexual exploitation of a child" also expressly includes "conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact." By its terms, that provision addresses various types of conduct by an actor that are directed at causing a child to perform sexual conduct or contact or to participate in the "exhibition" of such conduct or contact. *See, e.g., Webster's* at 747 (defining the verb "encourage" in part as to stimulate or incite); *id*. at 1142 (defining the verb "incite" in part as to bring into being or to induce to exist or occur).

However, in this case, there is no evidence from which a jury could find or infer that Charvet directed any action toward plaintiff. As discussed above, plaintiff testified that, while Charvet was masturbating, he did not "proposition" plaintiff to participate somehow, did not touch plaintiff, did not ask plaintiff to do the same thing, and did not prevent plaintiff from leaving Charvet's office; to the contrary, plaintiff testified that, during the incident, Charvet "became very distracted in what he was doing to himself." Thus, there is no evidence from which a jury could find or infer that Charvet "allow[ed], employ[ed], authorize[d], permit[ted], induce[d] or encourage[d]" plaintiff to do anything, much less that Charvet encouraged plaintiff to perform sexual conduct or contact or to participate in the "exhibition" of such conduct or contact.

As noted, plaintiff urges that, construed consistently with the plain and "common sense" meanings of the words "sexual" and "exploitation," Charvet's conduct constituted "sexual exploitation" within the meaning of ORS 12.117(2)(d). As we have noted, however, where the legislature has provided that a general term "includ[es] but [is] not

limited to" expressly enumerated items—here, specific types of conduct—that is not the applicable textual analysis. Rather, we determine the meaning of the general phrase by examining the characteristics of the enumerated items. As the above discussion demonstrates, none of Charvet's conduct is of the same type as the activities expressly enumerated in ORS 12.117(2)(d).

The two categories of contextual statutes on which plaintiff relies do not persuade us that our textual analysis is incorrect. Plaintiff first relies on the definition of "abuse" applicable to the child abuse reporting statutes, ORS 419B.005 to 419B.050. However, ORS 419B.005[12] expressly provides that the terms defined therein have those meanings "[a]s used in" the child abuse reporting statutes; nothing in the text of either ORS 12.117 or ORS 419B.005 makes those definitions applicable in the context of the former statute. In any event, none of the types of conduct described in the child abuse reporting statutes alters our understanding of ORS 12.117 here. We address the various types of conduct of that definition in three parts.

First, several of the types of conduct that constitute "abuse" under ORS 419B.005 involve physical contact with a child, such as assault, ORS 419B.005(1)(a)(A), rape, ORS

---

[12] The portions of that section relevant to our discussion provide as follows:

"(1)(a) 'Abuse' means:

"(A) Any assault * * * of a child and any physical injury to a child which has been caused by other than accidental means * * *.

"(B) Any mental injury to a child, which shall include only observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child.

"(C) Rape of a child * * *.

"(D) Sexual abuse, as defined in ORS chapter 163.

"(E) Sexual exploitation, including but not limited to:

"(i) Contributing to the sexual delinquency of a minor, as defined in ORS chapter 163, and any other conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact, as defined in ORS 167.002 or described in ORS 163.665 and 163.670, sexual abuse involving a child or rape of a child * * *; and

"(ii) Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167."

419B.005(1)(a)(C), and sexual abuse, ORS 419B.005 (1)(a)(D); plaintiff does not contend that Charvet committed conduct of that type.

Second, ORS 419B.005(1)(a)(B) refers to mental injury caused by "cruelty to a child." Even assuming that that subsection is relevant here, we would construe that phrase to have the same meaning as the identical phrase in ORS 12.117(2)(a)(B), discussed above. And, as we have done in the case of ORS 12.117(2)(a)(B), we would conclude that it is inapplicable to Charvet's conduct.

Third, plaintiff relies on ORS 419B.005(1)(a)(E)(i), pertaining to "[s]exual exploitation [of a child], including but not limited to" contributing to the sexual delinquency of a minor, as defined in ORS 163.435, and to conduct similar to that identified in the remainder of ORS 12.117(2)(d)(A) ("conduct which allows, employs, authorizes, permits, induces or encourages" a child to engage in, or to participate in an exhibition of, sexual conduct or contact). Again, we have determined that evidence is lacking of those types of conduct by Charvet here. In addition, although ORS 419B.005(1)(a)(E)(i) expressly refers to the description of sexual conduct or contact contained in ORS 163.665, which includes masturbation, ORS 163.665(3)(d), that reference is omitted from ORS 12.117, an omission that we infer to be deliberate. In short, nothing in the child abuse reporting statutes casts doubt on our understanding of the meaning and applicability of ORS 12.117.

Finally, the second category of statutes on which plaintiff relies as context involves the definition of "child abuse" in Oregon's Criminal Code. Plaintiff reasons that ORS 163.665(2) defines "child abuse" as "conduct that constitutes * * * a crime in which the victim is a child"; that the crime of endangering the welfare of a minor, ORS 163.575, is such a crime; that, under ORS 163.575(1)(a), endangering the welfare of a minor includes inducing, causing, or permitting an unmarried person under 18 years of age to witness an act of "sexual conduct" as defined in ORS 167.060; and that, under ORS 167.060(10), "sexual conduct" includes masturbation. Again, however, the legislature has made the definition of "child abuse" in ORS 163.665 specifically applicable only to

ORS 163.670 to 163.693, which set out crimes relating to the visual recording of sexual conduct of children. Accordingly, even aside from the fact that ORS 12.117 includes its own definition of the term "child abuse," the definition of "child abuse" in ORS 163.665 is of limited value as contextual evidence of the meaning of ORS 12.117.

In summary, evidence is lacking from which a jury could find that Charvet's actions met either of the relevant definitions of "child abuse" in ORS 12.117, as construed above. Plaintiff's claims based on those actions therefore are not subject to the extended statute of limitations provided therein and, accordingly, are time-barred, including both his claims for direct liability against Charvet and his claims against the archdiocese and the abbey under the doctrine of *respondeat superior*. Accordingly, we need not consider whether Charvet's actions were within the scope of Charvet's employment for the purpose of *respondeat superior* liability, as contended in plaintiff's second assignment of error. The trial court did not err, then, in dismissing plaintiff's claims against defendants based on direct and vicarious liability for Charvet's actions.

■      We turn to plaintiff's first assignment of error, pertaining to the vicarious liability of Frank's employers for his conduct. Plaintiff contends that, although the incidents of sexual abuse that were the bases of employers' vicarious liability in *Fearing* and *Lourim v. Swensen*, 328 Or 380, 977 P2d 1157 (1999), arose from the employees' "grooming" or "seduction" of the child victims over time, that particular type of predicate conduct is not required. Rather, according to plaintiff, the proper test is whether there is a "causal link" between an employee's authorized duties within the scope of his employment and the employee's tortious conduct. Plaintiff argues that such a link was present here because Frank had, in effect, absolute authority over him by reason of his priestly status and because the priest's exercise of that authority gave him the opportunity and the power to perpetrate the abuse. Plaintiff contends that a jury reasonably could find, from evidence of those circumstances, that Frank's assault was a "direct outgrowth of and w[as] engendered by conduct that was within the scope of [the priest's] employment" as required under *Fearing*. 328 Or at 377.

In response, the archdiocese argues that, although Frank's alleged conduct occurred within the space and time limits authorized by his employment, that conduct could not have been motivated in any part by a desire to serve the archdiocese and was not of a kind that he was hired to perform.[13] Specifically, the archdiocese contends that it is settled that an act of sexual abuse is not generally within the scope of employment and that liability also does not arise merely because the employment relationship gave the employee the opportunity to commit the tortious conduct. Applying those principles, the archdiocese argues that, in this case, where plaintiff acknowledged in his deposition that he had had no contact with Frank before the alleged assault—indeed, that he did not even remember whether Frank was his parish priest—Frank's conduct was not an "outgrowth of or engendered by" conduct within the scope of his employment.

Conversely, the archdiocese contends that no conduct of Frank that was within the scope of his employment "directly caused" or was a "necessary precursor" to the assault; in particular, even assuming that plaintiff subjectively felt compelled to obey Frank by reason of the latter's position as a priest, there is no evidence that Frank used his position to cultivate a relationship of trust with plaintiff. According to the archdiocese, plaintiff's claim in this case therefore suffers from the same deficiencies as the rejected claims of the plaintiffs in *Minnis v. Oregon Mutual Ins. Co.*, 334 Or 191, 48 P3d 137 (2002), and *Vinsonhaler v. Quantum Residential Corp.*, 189 Or App 1, 73 P3d 930 (2003). Conversely, plaintiff's claim is distinguishable from the claim in *Bray v. American Property Management Corp.*, 164 Or App 134, 988 P2d 933 (1999), *rev den*, 330 Or 331 (2000), in which there was evidence from which the jury could find that the employer's directive to the employee to prevent the plaintiff's decedent from parking in the employer's garage was a necessary precursor to, and directly caused, the employee's tortious action of stabbing and killing the decedent. Finally, the

---

[13] The response of the archdiocese is directed only at plaintiff's first assignment of error, relating to the trial court's disposition of the claim involving Frank's alleged conduct. The response of the abbey and Charvet encompasses both of plaintiff's first two assignments of error—that is, to the trial court's rulings pertaining to plaintiff's claims involving the conduct of both Frank and Charvet. Because the applicable legal standard is the same in each assignment, we consider together the parties' arguments relating to the first two assignments of error.

archdiocese contends that the religion clauses of the state and federal constitutions preclude reliance on Frank's status as a priest as the sole basis for civil liability.

In reply, plaintiff disputes defendants' characterization of his argument as one imposing strict liability on Catholic priests. Plaintiff argues that the proper inquiry is whether there was an "unbroken chain of causation" between Frank's act of picking him up after he fell in front of the church and the sexual assault; according to plaintiff, there was. He also contends that defendants do not dispute that all of Frank's acts leading up to the abuse were within the scope of his duties and do not dispute that they were "necessary precursors" to Frank's abuse.

■ ■ Under the doctrine of *respondeat superior*, an employer is vicariously liable for an employee's tortious conduct, including intentional torts, when the employee acts within the course and scope of employment. *Fearing*, 328 Or at 372. To establish that the employee acted within the course and scope of employment requires proof of three things: (1) the tortious act must have "occurred substantially within the time and space limits authorized by the employment"; (2) the employee must have been "motivated, at least partially, by a purpose to serve the employer"; and (3) the employee's act must be "of a kind which the employee was hired to perform." *Id.* at 373 (citing *Chesterman*, 305 Or at 442); *see also Minnis*, 334 Or at 201; *Vinsonhaler*, 189 Or App at 5. We examine the case law applying that test in order to illuminate the context of our application of that test to the facts in this case.

In *Chesterman*, an employee (who was also the president) of a corporation ingested an hallucinogenic drug to enable himself to continue working on a company project. While under the influence of the drug, he entered the plaintiff's house and sexually assaulted her. 305 Or at 441. The plaintiff brought an action against the corporation, alleging that the employee's ingestion of the drug was within the scope of his employment and was the cause of her injury. *Id.* at 443. The trial court granted the corporation's motion for summary judgment.

The Supreme Court reversed. The court concluded that, as a matter of law, the employee's acts of entering the

plaintiff's house and sexually assaulting her were outside the scope of his employment. *Id.* at 443. It also concluded, however, that there was evidence from which a jury could find that the plaintiff's injuries resulted from the ingestion of the hallucinogenic drug and that ingesting the drug *was* within the scope of the employee's employment. *Id.* Thus, consistently with *Chesterman*, plaintiff must present evidence from which a jury could find that his injuries were caused by conduct that was within the scope of Frank's employment.

*Fearing* applies that same inquiry in rather different circumstances. There, the court considered whether the plaintiff's complaint contained allegations sufficient to state a claim against the archdiocese for vicarious liability for a priest's acts of child abuse. The plaintiff had alleged that, when he was a minor in the early 1970s, the priest had acted as a "youth pastor, friend, confessor, and priest" for the plaintiff and his family and had gained the family's "trust and confidence"; by virtue of that relationship, the priest also had obtained the family's permission to spend "substantial periods of time" alone with the plaintiff and had used his position of trust to touch the plaintiff physically. 328 Or at 372. Eventually, the priest committed a series of sexual assaults against the plaintiff. The trial court dismissed the complaint for failure to state a claim for vicarious liability against the archdiocese, and this court affirmed.

In reversing that decision, the Supreme Court again explained that, in the intentional tort context, the relevant question is not whether the intentional tort itself was committed in furtherance of any interest of the employer or involved the kind of activity that the employee was hired to perform. *Id.* at 373-74, 376. Rather, the question is whether there is evidence of acts that were within the scope of employment that, in turn, resulted in the acts that caused the plaintiff's injury. *Id.* at 374, 376. The court concluded that the allegations in the plaintiff's complaint were sufficient to allow the jury to infer that the priest's conduct in cultivating a trust relationship with the plaintiff was motivated, at least in part, by a desire to further the interests of the archdiocese, that that conduct was of a kind that the priest was hired to perform, and that the conduct led to the sexual assaults; that is, that the sexual assaults "were the culmination of a progressive series of actions that began with and continued to

involve" the priest's performance of his ordinary and authorized duties. *Id*. at 375.

The court rejected the argument of the archdiocese that the plaintiff's allegations demonstrated only that the priest's employment gave him the "opportunity" to commit the alleged assault. The court explained that the jury

"reasonably could infer that [the priest's] performance of his pastoral duties with respect to [the] plaintiff and his family were a necessary precursor to the sexual abuse and that the assaults thus were a direct outgrowth of and were engendered by conduct that was within the scope of [the priest's] employment";

accordingly, the performance of those employment-related duties need not itself be the "cause" of the plaintiff's injury. *Id*. at 377. The court therefore reversed the trial court's dismissal of the complaint. Thus, in contrast to *Chesterman*—in which the course of conduct that arguably was within the scope of the employee's employment was of short duration and took place immediately before the conduct that caused the plaintiff's injury—*Fearing* involved employment-related conduct over an extended period of time.

*Lourim* also is instructive. There, the trial court dismissed for failure to state a claim the plaintiff's complaint alleging that the Boy Scouts of America were vicariously liable for a scout leader's tortious conduct. The plaintiff had alleged that the scout leader had been a duly authorized volunteer leader who had acted as a troop leader or assistant troop leader of the plaintiff's Boy Scout troop; that the plaintiff and his family had become "close" to the scout leader; that the scout leader had been a frequent guest in their home; that the scout leader had gained their trust and confidence as a "suitable friend, guide, mentor and role model" to the plaintiff (who was then an adolescent); and that, by virtue of that relationship, the family had allowed the scout leader to spend substantial amounts of time alone with the plaintiff and together with other boys in remote places. The scout leader then used his position of trust to gain the opportunity to touch the plaintiff physically; he eventually committed assaults against the plaintiff. 328 Or at 384-85.

The court considered whether those allegations were sufficient to show that conduct within the scope of the scout

leader's employment arguably resulted in the tortious acts. *Id.* at 386. The court concluded that, as in *Fearing,* a jury could have inferred that the scout leader's tortious conduct was "merely the culmination of a progressive series of actions that involved the ordinary and authorized duties of a Boy Scout leader"; that, in cultivating a relationship with the plaintiff and his family, the scout leader was motivated, at least initially, by a desire to fulfill his duties as a troop leader; that the scout leader's performance of his authorized duties was a necessary precursor to the tortious conduct; and that the assaults were "a direct outgrowth of and were engendered by" conduct within the scope of the scout leader's employment. *Id.* at 386-87. In short, the court determined that the complaint was sufficient to state a claim against the Boy Scouts under the doctrine of vicarious liability; it therefore reversed the trial court's dismissal of that claim. *Id.* at 388. Thus, *Lourim,* like *Fearing,* involved an extended course of employment-related conduct leading up to the conduct that caused the plaintiff's injury.

Next, in *Minnis,* the question was whether the insurer of a pizza business had a duty to defend the business against a tort claim brought by a former employee. 334 Or at 193. As pertinent here, the employee's complaint had alleged that a manager of the business had sexually harassed her in the workplace and had sexually assaulted her at his apartment. The insurer refused to defend. *Id.* at 197. After settling the employee's claims, the business owner brought an action against the insurer, to whom the trial court granted summary judgment. *Id.*

The Supreme Court affirmed, concluding that the only injury that was covered by the policy was the employee's bodily injury caused by conduct that the manager had committed against the employee at his apartment, not conduct in the workplace, which was subject to a policy exclusion. The question thus became whether the plaintiff had sufficiently alleged that that conduct was, in turn, caused by the manager's workplace conduct—that is, was conduct within the scope of the manager's employment. *Id.* at 201-02. The court concluded that she had not done so; rather, she merely had alleged that both the manager's workplace conduct and his conduct at his apartment were "episodes in a series" with no

cause-and-effect relationship. *Id.* at 202-03. Accordingly, the business was not subject to *respondeat superior* liability for the latter conduct of the manager. *Id.* at 207.

*Bray* also is instructive. In that case, the plaintiff and her husband habitually left their delivery van in the driveway of a parking garage managed by the defendant, where it obstructed the garage customers' use of the garage; plaintiff and her husband also parked their van in the garage at night without permission. 164 Or App at 136. The defendant employed a parking attendant at the garage, whom they neither expressly authorized to use nor prohibited from using force in carrying out his duties. One evening, the plaintiff's husband attempted to park in the garage. The parking attendant, who, after previous encounters with the plaintiff's husband, had been specifically instructed not to permit the husband to park there, attempted to stop him. A scuffle ensued, and the attendant fatally stabbed the husband. *Id.* at 137.

The plaintiff brought an action alleging that the defendant was vicariously liable for the attendant's conduct. *Id.* at 137-38. The jury returned a verdict for the plaintiff, and this court affirmed. *Id.* at 138. We concluded that, although the stabbing itself was not within the scope of the attendant's employment, nevertheless, as in *Fearing* and *Lourim*, the jury could have found that his conduct was "merely the culmination of a progressive series of actions that involved [the attendant's] ordinary and authorized duties"— that it was "the product of the escalating antagonism" between the attendant and the plaintiff's husband "centering on" the husband's attempted use of the garage and that it was an "outgrowth" of the defendant having told the attendant not to permit that use. *Id.* at 140-41 (citing and quoting *Lourim*, 328 Or at 386 (internal quotation marks omitted)). Thus, the plaintiff had demonstrated the necessary "direct causation" between the attendant's authorized employment duties and the conduct that caused the plaintiff's injury. *Id.* at 141.

We apply the described analysis to the record on summary judgment in this case as it relates to Frank's alleged conduct. We first note that the alleged sexual assault was not within the scope of Frank's employment; plaintiff

does not contend otherwise. *See Chesterman*, 305 Or at 443. Rather, we consider whether there is sufficient evidence in the summary judgment record of acts that *were* within the scope of Frank's employment that, in turn, resulted in the alleged sexual assault. That is, we consider whether there is evidence of conduct by Frank that was motivated, at least in part, by a purpose to serve the archdiocese; that was of a kind that Frank was hired to perform; and that resulted in the acts causing plaintiff's injury. *See Fearing*, 328 Or at 374, 376; *see also, e.g., Bray*, 164 Or App at 138-39 (applying test).

We conclude that the summary judgment record lacks sufficient evidence of such conduct. First, even if we were to assume that, as in *Fearing,* cultivation of a trust relationship with plaintiff and his family (who were members of that parish) would have been motivated by a desire to serve the parish and would have been a kind of conduct that Frank was hired to perform, the record is devoid of any evidence that Frank had cultivated that sort of relationship with plaintiff or his family before he assaulted plaintiff. In deposition testimony, plaintiff testified that he had not served as an altar boy with Frank, was not in the choir, and did not remember Frank coming to his family's house. When asked whether he had any contact with Frank prior to the alleged assault, plaintiff responded, "None that I remember" and "I don't even remember him being a parish priest there, to tell you the truth." In short, the record is devoid of evidence that, before the alleged assault, Frank performed pastoral duties in relation to plaintiff or his family that then led to the conduct that caused plaintiff's alleged injuries.

As an alternative to cultivation of a trust relationship as a basis for imposing vicarious liability, we address Frank's conduct immediately preceding the alleged assault. *See Chesterman*, 305 Or at 443 (determining an employer's vicarious liability based on an employee's actions in the hours preceding his tortious conduct). As previously described, the record shows that, one day when plaintiff was seven or eight years old, he and several other children were roller skating on the sidewalk around St. Mary's Church; that plaintiff fell down and scraped his knees; and that Frank, who was "dressed like a priest," walked over to where plaintiff had

fallen, helped plaintiff up, took him by a nearby stairway into the basement of the church, sat him on a table, and asked him to "take [his] pants down to look at [his] scraped knees," at which point he allegedly assaulted plaintiff. We consider whether, in engaging in that conduct immediately preceding the alleged sexual assault, Frank was motivated, at least in part, by a purpose to serve the archdiocese and whether his actions were of a kind that he was hired to perform.

As to the first inquiry, the record lacks any direct evidence from which a jury could find that Frank was so motivated. Frank himself is deceased, and there is no other evidence on the point. Moreover, where Frank's alleged sexual assault of plaintiff followed immediately on his initial contact with plaintiff, there is no basis for a jury reasonably to infer that Frank was motivated, initially or in part, to serve the archdiocese. *Cf. Lourim*, 328 Or at 386 (the plaintiff's allegations, if proved, would allow a jury to infer that the Boy Scout leader's conduct in cultivating over time a relationship with the plaintiff was motivated, at least initially, by a desire to fulfill his duties as a troop leader); *Fearing*, 328 Or at 374-75 (the plaintiff's allegations, if proven, would allow a jury to infer that the priest's conduct in cultivating over time a relationship with the plaintiff was motivated, at least initially, by a desire to fulfill his priestly duties).

In any event, we need not resolve the issue of Frank's motive because we conclude that evidence is lacking from which a jury could find that Frank's actions were of a kind he was hired to perform. Plaintiff contends that the archdiocese and the abbey do not dispute that, in taking the initial actions to help plaintiff with his scraped knees, Frank was "fulfilling the role of a caring pastor." However, plaintiff points to no evidence in the record affirmatively demonstrating that the described actions, or actions of that general nature, were part of Frank's particular employment duties in the parish. Rather, plaintiff relies in part on evidence in the record relating generally to church doctrine, under which priests have an exalted status and are expected and required to act as the ultimate authority on right and wrong. That is insufficient. Abstract doctrine regarding the status of priests within the Catholic Church sheds no light on the question

whether the particular actions at issue here were employment duties imposed on Frank, in his capacity as a parish priest of St. Mary's Church, by the archdiocese.

Plaintiff also relies on evidence relating to the respect and obedience that parishioners are trained to show to priests, including plaintiff's own affidavit attesting that he was taught to "revere and obey Catholic priests" and that, when Frank told him to remove his pants, "I believed from my teaching that I had no choice but to obey. Initially, he appeared to be concerned for my welfare as I was taught to expect from a priest." That evidence also is insufficient to show that Frank was carrying out authorized employment duties, however. Even assuming that plaintiff's unquestioning obedience of a priest's directives may have facilitated Frank's assault on him, evidence of such training, and the resulting obedience required to be shown to a priest by a parishioner, is not evidence of an employment duty of a particular priest.

In summary, with regard to Frank's actions toward plaintiff immediately preceding the alleged sexual assault, we conclude that the record lacks legally sufficient evidence to support a jury finding that, in performing those actions, Frank was motivated at least in part by a purpose to serve the archdiocese. Further, and fatally to plaintiff's claim based on Frank's conduct, the record lacks legally sufficient evidence to support a jury finding that Frank's actions were of a kind that he was hired to perform. Plaintiff accordingly failed to produce sufficient evidence that Frank's actions immediately preceding his alleged sexual assault were within the scope of Frank's employment. We therefore need not consider whether those actions led to the actions that caused plaintiff's injury. The trial court did not err, then, in granting summary judgment to defendants.

Affirmed.

**EDMONDS, J.,** concurring in part, dissenting in part.

This tort claim action and the liability that plaintiff seeks to impose on defendants arises from the conduct of two

priests, Charvet and Frank. I agree with the majority's reasoning and conclusions with regard to the conduct of Frank but not with regard to the conduct of Charvet.

With respect to vicarious liability for the conduct of both priests, *Chesterman v. Barmon*, 305 Or 439, 753 P2d 404 (1988), is the seminal case regarding whether an employer is liable for an employee's torts when the employee purportedly acts within the scope of employment. As the majority correctly recites, three requirements must be satisfied in order to conclude that an employee's tort was within the scope of employment: (1) the act occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, in part, by a purpose to serve the employer; and (3) the act is of a kind that the employee was hired to perform. 305 Or at 442. Even though a particular act, like a sexual assault, may not be within the actual scope of employment, if acts that were within the scope of employment resulted in conduct that led to the injury to the plaintiff, then vicarious liability exists. *Id.* at 443.

Even when plaintiff is given the benefit of all reasonable inferences that flow from the evidentiary record, there is no evidence that Frank was performing a pastoral role defined for him by his employer or by his job description that resulted in the sexual assault on plaintiff. It was merely coincidence that Frank encountered plaintiff while plaintiff was roller skating on a sidewalk adjacent to the church. Plaintiff had fallen down, and Frank, on the pretense of examining plaintiff's scraped knees, asked plaintiff to take his pants down. The sexual assault on plaintiff followed thereafter. There is simply no evidence that Frank's assistance to plaintiff constituted the performance of his job duties. Rather, by coming to the aid of plaintiff, an injured eight-year-old boy, Frank conducted himself in the same way that any concerned bystander might have. It follows that the majority correctly holds that the archdiocese is not vicariously liable for the conduct of Frank.

In contrast to the conclusion that follows from the application of the above rules to Frank's conduct, the circumstances of Charvet's abuse of plaintiff require a different result when plaintiff is given the benefit of all reasonable

inferences that flow from the circumstances of the incident. The Charvet incident occurred when plaintiff was a student at Mt. Angel Seminary. Charvet was plaintiff's faculty advisor and dormitory proctor. Charvet asked plaintiff to meet him in Charvet's office. Obviously, any freshman high school student who is asked by a faculty advisor to meet with him would understand that the advisor was exercising his authority over him by virtue of their faculty-student relationship. Indeed, plaintiff was instructed by Charvet to stand in front of Charvet's desk. Charvet began the encounter by asking plaintiff what plaintiff knew about the subject of sexuality and reproduction, including the subject of masturbation. A jury could reasonably find that Charvet was inquiring of plaintiff about a subject that was within the scope of Charvet's authority to counsel him as plaintiff's freshman advisor and dormitory proctor. A jury could also reasonably infer from the evidence that Charvet began to masturbate in plaintiff's presence.[1] Although Charvet did not touch plaintiff at that time or encourage him to participate in sexual activity, a jury could reasonably infer from the evidence that Charvet masturbated in plaintiff's presence in order to induce him to participate in future sexual conduct with Charvet. It follows, when plaintiff is given the benefit of all reasonable inferences that arise in his favor from the summary judgment record, that a jury could find defendant Mt. Angel Abbey vicariously liable for Charvet's conduct. That is so because the abuse occurred while Charvet was purporting to counsel plaintiff, conduct that the abbey authorized Charvet to perform on its behalf as a faculty advisor and dormitory proctor.

The remaining question for purposes of summary judgment and the determinative issue, in my view, is whether plaintiff's claim based on Charvet's abuse is timely in light of ORS 12.117(2)(a)(B).[2] The core of my disagreement

---

[1] Defendants are entitled to summary judgment only if no genuine issue of material fact exists when the record is viewed in the light most favorable to plaintiff and when no objectively reasonable juror could return a verdict for him. ORCP 47 C.

[2] Mt. Angel Abbey also argues that because Charvet did not touch plaintiff, ORS 12.117 is inapplicable. In my view, the commission of an act of cruelty to a child does not require a physical touching as a matter of law.

with the majority lies in the majority's mistaken belief that when the legislature enacted ORS 12.117(2)(a)(B) in 1989, it did not intend to encompass within the tolling provisions of the statute conduct like Charvet's abuse of his relationship with plaintiff. In other words, the majority believes that Charvet's conduct was not within the contemplation of the legislature as intentional conduct by an adult that constituted "cruelty" to a child. To begin with, I agree with the majority that the proper focus is on the meaning of the words "[a]ny mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child." However, unlike the majority, I believe that the meaning of that phrase can be discerned from the text and the context of the statute itself, and nothing in the majority's recitation of legislative history undercuts that meaning.

The above phrase can be dissected into three discrete requirements: (1) a mental injury to the child; (2) that results in an observable and substantial impairment of the child's mental or psychological ability to function; and (3) that is caused by "cruelty to the child, with due regard to the culture of the child." The controversy in this case centers on the word "cruelty." None of the words in the statutory phrase has a meaning specifically defined by statute. In the absence of any intent by the legislature for the words in the phrase to have special meaning, we give words of common usage in a statute their ordinary dictionary meaning. Here, the word "cruelty" and its derivatives are words of common usage that have ordinary dictionary meanings that connote inhuman treatment or the causing of pain or distress. *Webster's Third New Int'l Dictionary* 546 (unabridged ed 2002). Thus, in a general sense, the word and its derivatives can apply to a number of circumstances and therefore, on its face, "cruelty" would seem to be susceptible to more than one reasonable interpretation. However, where words of common usage are used in a way that has a well-defined legal meaning to the legislature, they will be given that particular meaning. *Wal-Mart Stores, Inc. v. City of Central Point*, 341 Or 393, 397, 144 P3d 914 (2006).

By the time that ORS 12.117(2)(a)(B) was enacted in 1989, the term "cruelty" had been used in a number of Oregon statutes related to child abuse.[3] In fact, the child abuse reporting statutes, *former* ORS 418.740 to 418.775 (1987), *repealed by* Or Laws 1993, ch 546, § 141, similarly defined "child abuse" to include "[a]ny mental injury to a child, which shall include only observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child." *Former* ORS 418.740(1)(b) (1987). The term "cruelty" also appeared in *former* ORS 416.030(2)(c) (1987), *repealed by* Or Laws 2001, ch 900, § 261, which pertained to exemptions from liability concerning public assistance payments. That statute provided that no liability for the support of a needy person shall be imposed under the Relatives' Financial Responsibility Law on "[t]he child of a needy person if, during the minority of the child, such person wilfully deserted or abandoned the child, or, by expulsion or *cruelty*, drove the child from the parental home * * *."[4] (Emphasis added.) Also, under *former* ORS 419.523(2)(c) (1987), *repealed by* Or Laws 1993, ch 33, § 373, parental rights could be terminated based on conduct "toward any child of an abusive, cruel or sexual nature."

Also, prior to the enactment of ORS 12.117(2)(a)(B), we interpreted the word "cruelty" in ORS 416.030(2)(c) in accordance with the Supreme Court's use of that term in a related context. *Kerr v. Welfare Comm.*, 3 Or App 27, 31, 470 P2d 167 (1970), *cert den*, 402 US 950 (1971). We relied on *Chaffin v. Chaffin*, 239 Or 374, 397 P2d 771 (1964), which addressed the type of conduct by a father toward his child that could give rise to the child's right of action against the father. In *Chaffin*, the court held:

---

[3] Beginning in 1884, the appellate courts began to wrestle with what conduct constitutes "cruelty" in other contexts. *See, e.g., Taylor v. Taylor*, 11 Or 303, 8 P 354 (1884) (holding that a divorce decree granted on the ground of cruelty must be reversed for insufficient evidence). Before 1971, a statutory ground for divorce in Oregon was "[c]ruel and inhuman treatment[.]" *See, e.g., former* ORS 107.030(6) (1969), *repealed by* Or Laws 1971, ch 280, § 28.

[4] *See also former* ORS 163.650 (1969), *repealed by* Or Laws 1971, ch 743, § 432 (making it unlawful for any person, not being a parent of the child, to "cruelly" mistreat and maltreat a child under the age of 16 years); *State v. Samter*, 4 Or App 349, 479 P2d 237 (1971) (interpreting that statute).

"[A]n act by a parent, whether described as willful or malicious or wanton, which will pierce the veil of parental immunity, is an act which is done with an intention to injure the child or is of such a cruel nature in and of itself as to evidence not a reasonably normal parental mind, but an evil mind, *malo animo*."

239 Or at 387. The court then concluded that allegations of a father's gross negligence were not sufficient to "be considered as an act of cruelty in and of itself, disclosing a cruel mind or wicked intent." *Id*. We recognized that *Chaffin* was decided in a different context but nevertheless concluded that it "aptly describes the type of conduct necessary to constitute 'cruelty' within ORS 416.030(2)([c]),[5] thereby insulating a child from liability for contribution for the support of a parent under the Act." 3 Or App at 31.

The *Chaffin* construct, which we imported into *former* ORS 416.030(2)(c) in *Kerr*, is also consistent with the definition of the term "cruelty" in *Black's Law Dictionary*. *See Wal-Mart Stores, Inc.*, 341 Or at 398 (referring to *Black's Law Dictionary* to determine the well-established legal meaning of the term "service"). At the time that each of the above-referenced statutes was enacted, that dictionary defined the term "cruelty" as

"[t]he intentional and malicious infliction of physical suffering upon living creatures, particularly human beings; or, *as applied to the latter, the wanton, malicious, and unnecessary infliction of pain upon the body, or the feelings and emotions; abusive treatment; inhumanity; outrage*."

*Black's Law Dictionary* 340 (5th ed 1979) (emphasis added).[6]

Thus, at the time that ORS 12.117 was enacted, the term "cruelty," at least with respect to conduct toward children, was generally understood by the legislature to encompass two categories of acts. First, the term included acts that were specifically intended to inflict harm on a child by an

---

[5] At the time of the decision in *Kerr*, the relevant provision of *former* ORS 416.030 was numbered 2(b) rather than 2(c).

[6] The most recent edition of *Black's Law Dictionary* no longer includes the text emphasized above. *Black's Law Dictionary* 405 (8th ed 2004). It now contains a separate reference to the term "cruelty to a child" and simply cross-references the definition for "child abuse." *Id*.

actor, *i.e.*, any act intended to harm a child was, by definition, cruel to the child. Second, the term included the performance of acts that by their very nature expressed a wanton disregard for the welfare of the child such that they evidenced an "evil mind."

That dualistic understanding of the legislature's use of the word "cruelty" is supported by the texts of the various statutes designed to prevent "child abuse" and the policy underlying those statutes. In particular, that understanding is consistent with the provisions of the child abuse reporting statutes, a portion of which was imported by the legislature into ORS 12.117 in 1989. The legislative policy underlying those abuse reporting statutes was expressed in *former* ORS 418.745 (1987):

> "The Legislative Assembly finds that for the purpose of facilitating the use of protective social services to prevent further abuse, safeguard and enhance the welfare of abused children, and preserve family life when consistent with the protection of the child by stabilizing the family and improving parental capacity, it is necessary and in the public interest to require mandatory reports and investigations of abuse of children."

Also, *former* ORS 418.740(1) (1987) provided that "[a]buse" means:

> "(a)  Any physical injury to a child which has been caused by other than accidental means, including any injury which appears to be at variance with the explanation given of the injury.
>
> "(b)  Any mental injury to a child, which shall include only observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child.
>
> "(c)  Sexual abuse, including but not limited to rape, sodomy, sexual abuse, sexual penetration with a foreign object and incest, as those acts are defined in ORS chapter 163.
>
> "(d)  Sexual exploitation, including but not limited to:
>
> "(A)  Contributing to the sexual delinquency of a minor, as defined in ORS chapter 163, and any other conduct which allows, employs, authorizes, permits, induces or

encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact, as defined in ORS 167.002 or described in ORS 163.665 and 163.670, or sexual abuse involving a child, but not including any conduct which is part of any investigation conducted pursuant to ORS 418.760 and which is not designed to serve educational or other legitimate purposes; and

"(B) Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167.

"(e) Negligent treatment or maltreatment of a child, including but not limited to the failure to provide adequate food, clothing, shelter or medical care. However, any child who is under care or treatment solely by spiritual means pursuant to the religious beliefs or practices of the child or the child's parent or guardian shall not, for this reason alone, be considered a neglected or maltreated child under this section.

"(f) Threatened harm to a child, which means subjecting a child to a substantial risk of harm to the child's health or welfare."

Thus, *former* ORS 418.740(1) (1987) protected children from physical and mental injury by requiring the reporting of a variety of acts. Some of those acts pertained to intentional physical injury to children, *former* ORS 418.740(1)(a); some involved mental injury to children, *former* ORS 418.740(1)(b); some were crimes that presumptively caused physical or mental injury to children, *former* ORS 418.740(1)(c) and (d); and some involved negligence, maltreatment, and even threatened harm to children, *former* ORS 418.740(1)(e) and (f). In light of the broad scope of the child abuse reporting statutes—which included even acts of negligence that put children at risk—the legislature certainly would have intended to include, within the definition of "cruelty," acts that were either specifically intended to inflict harm on a child or acts that by their very nature were of such wanton disregard for the welfare of a child that they evidenced an evil intent on the part of the actor. It would be

nonsensical to require mandatory abuse reporting of negligent acts that *could* harm a child while, at the same time, not requiring the reporting of a mental injury that *has actually occurred* as the result of conduct intended to inflict that injury or conduct that evidenced a wanton disregard for the child's welfare.

In sum, to protect children from mental injuries, the legislature intended the word "cruelty" in *former* ORS 418.740(1)(b) to have a well-defined legal meaning—that is, to describe acts that are intended to inflict mental injury on a child as well as acts that, by their very nature, manifest a wanton disregard for the welfare of the child and an evil intent. When the legislature adopted the language of *former* ORS 418.740(1)(b) in ORS 12.117(2)(a)(B) as a basis for tolling the running of the statute of limitations on claims for civil damages arising out of child abuse, the legislature manifested an intent to similarly extend the time for bringing a claim for mental injuries that were either intentionally inflicted or were inflicted by actions that, by their very nature, qualified under the second category of "cruelty."

The question, therefore, is whether Charvet's masturbation in front of a 14-year-old child, after compelling the child to be in his presence for the ostensible purpose of imparting sex education, is the kind of act that falls within the second category of "cruelty" as contemplated by the legislature through its enactment of ORS 12.117(2)(a)(B). Said another way, is Charvet's conduct of such a nature that it evidences a wanton disregard for the welfare of a child and an "evil mind"? As a matter of common sense, I would conclude that masturbating in front of a child is conduct that the legislature would have regarded as evidencing a wanton disregard for the welfare of the child and an "evil mind."

There was, however, another statute in effect at the time that the legislature enacted ORS 12.117(2)(a)(B) that further informs the issue. ORS 163.575(1) (1987) provided that "[a] person commits the crime of endangering the welfare of a minor if the person knowingly: (a) [i]nduces, causes or permits an unmarried person under 18 years of age to witness an act of sexual conduct * * * as defined by ORS 167.060[.]" ORS 167.060 (1987) defined "sexual conduct" to

include "human masturbation." In other words, had Charvet caused plaintiff to witness him masturbating in 1989, when the legislature enacted ORS 12.117(2)(a)(B), that conduct would have constituted the crime of endangering the welfare of a minor.[7]

Given the interrelated purposes of the various statutes protecting children from abuse, it is apparent that the legislature would have intended "cruelty" to include at least some of those acts that it made crimes under ORS 163.575(1) (1987). Although not all acts that endanger a child necessarily constitute acts of "cruelty," the common legislative policy underlying the various statutory schemes suggests that the legislature, by making such conduct a crime, would also have intended masturbating in front of a child to constitute "cruelty" for purposes of the child abuse reporting statutes and the statute of limitations in ORS 12.117.[8] Also, I have no

---

[7] ORS 163.575(1) (1987) described a number of acts that the legislature considered to endanger the welfare of minors, including permitting a minor to remain in a place where unlawful activity involving controlled substances occurred, inducing a minor to participate in illegal gambling, selling a minor tobacco products, and selling a minor articles used to deliver smoke from controlled substances. Most, if not all, of the acts enumerated are acts that the legislature apparently deemed to be in such wanton disregard of the welfare of children that they evidenced an evil intent.

[8] The majority seizes on the fact that some of the acts in ORS 163.575(1) (1987) do not by their nature constitute "cruelty to a child" and then relies on *former* ORS 419.476(1)(c) (1987), *repealed by* Or Laws 1993, ch 33, § 373, which, in its view, "controverts the inference that the dissent draws from ORS 163.575[.]" 218 Or App at 674-75 n 7. *Former* ORS 419.476(1)(c) (1987) provided that a child was within the jurisdiction of the juvenile court if the child's "behavior, condition or circumstances are such as to endanger the welfare of the person or the welfare of others[.]" The majority therefore concludes that, "[p]roperly interpreted, that statute demonstrates that the legislature regarded child endangerment and cruelty to a child as two separate concepts." 218 Or App at 674-75 n 7. The majority misses the point of the comparison of the provisions of ORS 12.117(2)(a)(B) with the provisions of *former* ORS 418.740(1)(b) (1987), *former* ORS 416.030(2)(c) (1987), *former* ORS 419.523(2)(c) (1987), *former* ORS 419.476(1)(e) (1987), and ORS 163.575(1) (1987). I do not rely on any of those statutes to directly equate the concepts of cruelty to a child and endangering a child. I recognize that it does not necessarily follow from the fact that conduct endangers a child that it also constitutes "cruel" conduct. But on the other hand, conduct could both be "cruel" and endanger the welfare of the child. Under *former* ORS 419.476 (1987), a child could have been within the jurisdiction of the juvenile court because the child's circumstances endangered the child's welfare or because the child had been subjected to cruelty, or for some other reason, and the child's circumstances could satisfy more than one of those bases for jurisdiction. Thus, it does not logically follow from the fact that the legislature intended that there be multiple grounds for juvenile court jurisdiction, that it also did not have a well-defined understanding of what conduct constituted "cruelty to

doubt that, with respect to masturbation in front of a child, the legislature also would have intended mandatory abuse reporters to report that conduct in the event that a mental injury resulted from it. Because ORS 12.117(2)(a)(B) is similarly intended to protect children from abuse, and because the statute of limitations is tolled under ORS 12.117(2)(a)(B) for the same conduct that would be reported by mandatory abuse reporters in the case of mental injuries, I conclude that Charvet's conduct constitutes an act of "cruelty" under ORS 12.117(2)(a)(B). It follows that the trial court erred when it granted summary judgment on the basis of ORS 12.117(2)(a)(B) and that plaintiff should have the opportunity to have a jury decide whether the statute tolls his claims against Charvet and Mt. Angel Abbey.[9]

---

children," or that Charvet's conduct, a crime under an existing statute, would not fall within the parameters of the legislature's contemplation regarding the general understanding of the meaning of that phrase. In sum, the language in *former* ORS 419.476(1)(c) (1987) does not "controvert" any inference arising from all of the statutes existing in 1989 that pertained to cruelty to a child; rather, it is additional support for the understanding advanced above.

[9] I do not understand Mt. Angel Abbey to have argued to the trial court in its summary judgment motion that plaintiff discovered his injury and its causal connection more than three years before he brought this action, thus causing his claim to have expired before he brought the action. Rather, it argued that "Father Charvet allegedly masturbating in front of plaintiff when plaintiff was in high school is not 'child abuse' as a matter of law" and "Mt. Angel cannot be held vicariously liable for the alleged acts of Father Charvet." Because the above issue does not appear to have been litigated in the trial court, we are unable to consider whether the trial court's ruling was correct for the wrong reason.